GERALD J. LAPIERRE *vs.* MASSACHUSETTS COMMISSION
AGAINST DISCRIMINATION.

Worcester.    February 6, 1968. — April 9, 1968.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & KIRK, JJ.

*Anti-Discrimination Law.    Words,* "National origin," "National an-
cestry."

A conclusion by the Massachusetts Commission Against Discrimination
that the landlord of an apartment refused during a certain period to
negotiate with prospective tenants thereof in good faith and to rent
the apartment to them was supported by substantial evidence on a
complaint by them under G. L. c. 151B, § 5, including evidence that
the landlord did not negotiate with the complainants as he did with
other prospective tenants in the same period and that if he had done
so he would have rented the apartment to the complainants, that he
sought to avoid any occasion for negotiating with them, and that he
postponed declaring a decision as to renting to them by insisting, not
in good faith, on a credit check. [167]
Where it appeared, upon a petition for review under G. L. c. 151B, § 6,
and c. 30A, § 14 (8) of a decision by the Massachusetts Commission
Against Discrimination on complaints under c. 151B, § 5, by a husband
and wife as prospective tenants of an apartment against its landlord,
that the commission's conclusion that the landlord refused during a
certain period to negotiate with the complainants in good faith and to
rent the apartment to them was based on findings supported by sub-
stantial evidence, but that the commission's conclusion that the land-
lord knew of the husband's national origin and refused because of it
to negotiate and to rent to the complainants was not supported by
substantial evidence, and that the discrimination shown could have
been for an illegal reason, a final decree of the Superior Court ordering
the commission to dismiss the complaints was vacated, and the case
was remanded to the commission for further evidence and findings.
[171–173]
In the Anti-Discrimination Law, G. L. c. 151B, as amended, the terms
"national origin" and "national ancestry" are not mutually exclusive,
and a complaint against a landlord for an unlawful practice under
§ 4, as amended through St. 1963, c. 197, § 2, by a prospective tenant
who was a Puerto Rican charging discrimination because of his
"national origin" stated an offence under the statute, although in fact
the alleged discrimination was because of the complainant's national
ancestry. [174–175]

PETITION filed in the Superior Court on October 26, 1966.

The case was heard by *DeSaulnier*, J.

*John J. Roche*, Special Assistant Attorney General, for the respondent.

*Charles F. Nayor* for the petitioner.

WHITTEMORE, J. Complaints before the Massachusetts Commission Against Discrimination brought by Segundo Cruz and his wife, Arleen Cruz, charged the petitioner, LaPierre, with unlawful discrimination because of Segundo's "national origin" in violation of G. L. c. 151B, in respect of the renting of an apartment at 105 Charlton Street, Southbridge.

The Commission after a hearing made extensive findings and concluded that LaPierre had refused to negotiate in good faith and had withheld the apartment because of Cruz's national origin. It ordered, inter alia, that LaPierre desist from withholding the apartment and offer it to the Cruzes. It was stipulated before the Commission that Segundo Cruz is Puerto Rican.

General Laws c. 151B, § 4, as amended through St. 1963, c. 197, § 2, provides, "It shall be an unlawful practice: . . . 7. For the owner . . . of other covered housing accommodations . . . (a) to refuse to rent or lease . . . or negotiate for . . . lease or otherwise deny to or withhold from any person . . . such accommodations . . . because of the race, creed, color, national origin, or national ancestry of such person . . . ."

The apartment appears to be, as the Commission found, within the meaning of "other covered housing accommodations." See c. 151B, § 1, par. 13.

LaPierre filed a petition for review under G. L. c. 151B, § 6, and c. 30A, § 14 (8). A judge in the Superior Court ruled that the findings, the conclusions of law, and the orders were unsupported by substantial evidence and remanded the cause to the Commission. The Commission, after hearing counsel, in "consideration of all the evidence" reaffirmed its prior findings and conclusions of law, and its

order. On a second petition for review, a final decree was entered in the Superior Court ruling as before ("unsupported by substantial evidence"). The decree ordered that the Commission dismiss the complaints against LaPierre.

This appeal by the Commission to this court affords review "in the same manner and form and with the same effect as in appeals from a final order or decree in proceedings in equity." G. L. c. 151B, § 6. The issues are whether there was substantial evidence of refusal to rent or to negotiate and whether this was because of Cruz's "national origin" within the meaning of the statute.

1. The conclusion of refusal to negotiate with the Cruzes in good faith and to rent to them was supported by substantial evidence. G. L. c. 30A, § 14 (8) (e). *McCarthy* v. *Contributory Retirement Appeal Bd.* 342 Mass. 45, 47, and cases cited. Compare *Sinclair* v. *Director of the Div. of Employment Security,* 331 Mass. 101, 102; *Singer Sewing Mach. Co.* v. *Assessors of Boston,* 341 Mass. 513, 517.

The findings, with support in the evidence, including testimony by LaPierre, tend to show that he did not negotiate with the Cruzes as he did with others in the same period; if he had done so he would have rented the apartment to them; he sought to avoid any occasion for negotiation; and he postponed declaring a decision as to renting by insisting, not in good faith, on a credit check. In the following summary we state the findings only, except where the testimony is expressly referred to.

Prior to October, 1965, Mrs. Cruz learned of LaPierre's offering for rent an apartment in his six apartment building at 105 Charlton Street, Southbridge, went to the premises, and was shown the apartment by a tenant of another apartment. Mrs. Cruz then telephoned to and made several trips to LaPierre's place of business. Each time she talked with LaPierre's foreman. He told her that he did not have the keys and she would have to see LaPierre. Each time she telephoned he said he would have to speak with LaPierre who was not in. LaPierre was out of town a good deal and the foreman accepted inquiries, sometimes showed the places

that were for rent and left written messages for LaPierre.[1] The foreman left written messages concerning Mrs. Cruz's inquiring for LaPierre who never returned the calls. LaPierre denied receiving the messages. The testimony of Mrs. Cruz as to the calls is corroborated in important aspects by the foreman[2] who had continued in LaPierre's employ and had not heard LaPierre's contrary testimony. The Commission of course was not obliged to accept LaPierre's testimony and could weigh his denial on the issue of his good faith.

In the week of October 12 (a Tuesday), from the home of her sister, Mrs. Gloria Grzembski, Mrs. Cruz again called the "LaPierre Mill Works" and spoke to a man who told her she would have to speak to LaPierre and that he was out. Immediately thereafter Mrs. Grzembski called the works, inquired about the vacant apartment, and talked with the foreman who told her he would make arrangements for her to see the apartment. Later that day she received a call from LaPierre himself who asked if she was interested in the apartment. She replied that she was, but would have to discuss it with her husband. She asked if she could have the apartment if she wanted it, and LaPierre said that she could. No reference was made to credit.

These findings are based on the testimony of Mrs. Grzembski corroborated in substantial part by the other persons concerned. The foreman recalled that Mrs. Grzembski had

---

[1] LaPierre testified, "My man that runs my shop will take phone calls and will say either we have a four . . . or a five-room apartment and what the rent is. . . . And he is to take the name. . . . I take the list of what I have got to do and, from there on in, it's my problem." THE COMMISSION: "So then, if Mrs. Cruz says that she called and she left her name with some-one. . . ." THE WITNESS: "I should have had it. . . . I never received a message from Mrs. Cruz, and I never spoke to Mrs. Cruz until the day she came in with Mrs. Snitzer."

[2] The foreman testified. COUNSEL FOR LAPIERRE: "Now, sometime before October, before October of '65, do you recall getting any calls by anybody who left the name, 'I am Mrs. Segundo Cruz'?" THE WITNESS: "Well, there is a Mrs. Cruz that called." COUNSEL: "There was a Mrs. Cruz?" THE WITNESS: "Yes." COUNSEL: "And when would you say she called?" THE WITNESS: "I couldn't tell you; she called several times." COUNSEL: "She did call several times?" THE WITNESS: "Yes." COUNSEL: "What did you do with the messages?" THE WITNESS: "I just left it for Gerry [LaPierre]; and Gerry is not around." COUNSEL: "Was he around at that time?" THE WITNESS: "He's away a great deal of the time."

called and testified that he had "probably" left a note on LaPierre's desk.   LaPierre testified that he got a message that Mrs. Grzembski had called for an apartment and "that same day . . . [he] was in town" and that he called her, described the apartment at 105 Charlton Street, and stated the rent ($17 a week payable monthly);  he testified that she said she would have to speak to her husband and that he told her that if she was interested he would show her the apartment.   Later he testified that he told her she could have the apartment.[3]

On or about October 15, 1965, Mrs. Shirley Snitzer, Chairman of the Fair Housing Committee of Southbridge, Sturbridge and Webster, inquired of LaPierre about the availability of the apartment at 105 Charlton Street, telling him that she wanted to look at the apartment for her cousin. LaPierre told her that it was still available and that it would take two or three days to fix it up.  He gave her the key and told her that it would rent for $17 a week.   Mrs. Snitzer thereafter drove Cruz and his wife to the apartment and inspected it with Mrs. Cruz.

The three then drove to LaPierre's mill and Mrs. Cruz and Mrs. Snitzer went in and saw LaPierre and his foreman. Mrs. Snitzer told LaPierre that Mrs. Cruz was the cousin for whom she wanted the apartment.   Mrs. Cruz was not, in fact, Mrs. Snitzer's cousin.   Mrs. Cruz identified herself as "Mrs. Segundo Cruz," told LaPierre that she wanted the apartment, and offered to place a $20 deposit on it.   He declined to take the deposit, giving as his reasons that the apartment was not ready, that he would have to do a credit check on her and that the rent would be at a monthly rate.   Mrs. Snitzer gave LaPierre her address and telephone number and asked him to call her as soon as he decided to let Mrs. Cruz have the apartment.   LaPierre did not request any information of a personal nature from Mrs. Cruz. He did not call Mrs. Snitzer.

After complaint had been filed with the Commission on

---

[3] LaPierre testified that he would not have rented the apartment to Mrs. Grzembski without a credit check.

October 19, 1965, and during a visit from a field representative of the Commission, LaPierre consented to accept a deposit and stated that he wanted to run a credit check. He had a credit check run on the Cruzes by his local bank and about a month later he wrote to the complainants telling them that he deemed their credit unsatisfactory and that he would not rent them the apartment. The Commission excluded from evidence the contents of the credit report. At no time and for no other tenant or prospective tenant had LaPierre run a credit check.

LaPierre contends that the absence of a credit check of others was of no significance; that his testimony shows that he had had few vacancies; that most of the tenants had been local people whom he knew; and that in the previous July, when he concluded he would have to evict tenants who owed back rent, he decided that he would take more precautions. The testimony as to the absence of requests to others for credit references is, however, to be read with the testimony of how LaPierre acted in respect of the Cruz credit check. So read, it supports the conclusion of a refusal to negotiate in good faith.

The evidence tended to show the following: It was only after LaPierre, on October 15, had learned Mrs. Cruz's name, that he said, inter alia, that he would take no deposit from anyone until the apartment was all fixed up and that he wanted a credit check. In the conference with the field representative on the next Tuesday, October 19, LaPierre said, "She's never come back with the deposit . . . and if her credit checks out she can have the apartment." He asked the investigator, "[w]ill you give me two weeks . . . [to make the credit check] [b]ecause I am out of town five days a week. . . . [I]f you give me a couple of weeks, I will get it done and I will call and let you know." Mrs. Cruz promptly called at the mill office, paid a $68 deposit and left a list of credit references, including two banks and a jeweler. LaPierre received the list on the next Friday and at some time checked two of the references. Arch Jeweler said she had just bought a vacuum cleaner and made two

payments. The Webster bank said that all they could say was "she has a loan on an automobile." They did not say it was in default. There was evidence that it was not. There was no indication of an effort to check with Cruz's employer.

The field representative called LaPierre on November 2, 1965, and asked when the apartment would be available for Mrs. Cruz. LaPierre, as he testified, replied that he had not made a credit check yet and he "intended to do it as soon as . . . [he] could get to it" and he would notify Mrs. Cruz when he got the credit report. He told the investigator, as the latter recalled, that he was not sure when he could do it "because of his problem he was having in Vermont."

LaPierre called the Southbridge Credit Bureau but found he had to be a member in order to get a report. He then called his own bank. When the bank asked why he wanted the information he replied, as he testified, "I have been told that I have discriminated this person and . . . that I got 20 days to check her credit."

2. The second issue is whether there is support for the conclusion that the refusal to negotiate and to rent was because LaPierre knew that Cruz is Puerto Rican.

The Commission ruled that illegal conduct had been shown in what happened prior to October 19.[4] But the Commission's express findings as to what LaPierre knew and why he acted in a discriminatory way as of that date clearly go beyond the evidence. The Commission found: "12. The respondent [LaPierre] knew that the complainant, Segundo Cruz, was Puerto Rican at the time of the commission of the unlawful act. The respondent declined to respond in his usual way to telephone messages from Mrs. Cruz which were left him by his foreman because he knew Segundo Cruz was Puerto Rican. The sole reason for respondent's

---

[4] See for example finding 11: "No credit check had been made at the time of the alleged unlawful practice. The respondent [LaPierre] had no basis for denying the complainants the apartment because of alleged unsatisfactory credit at the time of the illegal act. Only after the complaint had been filed . . . alleging the unlawful act did the respondent seek information regarding the complainant's credit."

denying the complainant's rental of the apartment in question was that Segundo Cruz was Puerto Rican."

On the subsidiary findings it appears that, prior to the conference with the field representative on October 19, LaPierre knew as to the possible ethnic classification of the applicant and her husband only the name Segundo Cruz. That name, the Commission could conclude, may have suggested the possibility that Cruz was of Puerto Rican origin. LaPierre's testimony about the interview shows a significant distinction in his mind between Puerto Ricans and persons who are "white."[5] Discrimination because of the name Segundo Cruz is suggested by the evidence of unwillingness even to talk about renting with a woman who gave that name and the contrasting evidence of willingness to rent without a credit check to two unseen persons identified only by name or a supposed cousin's name.

We assume that evidence justifying a conclusion of a refusal to rent because of suspected national origin, later established, may be ruled to be refusal to rent because of national origin. On this issue evidence of consistent conduct of LaPierre after he had credible information of national origin, such as is shown here, is relevant.

But, as noted, the Commission based its conclusion and its order on the findings that LaPierre knew that Cruz was a Puerto Rican when illegal acts were done before October 19. The only refusal to rent by LaPierre when in fact he had such knowledge was in the November, 1965, letter after the credit check. If LaPierre's knowledge was to be the basis of the conclusion and order, his knowledge at the time of that letter, including the credit report, was relevant. If the conclusion and order were to be based on other findings justified by the evidence they should have been stated.

There is an additional reason why the Commission should have weighed LaPierre's acts in the light of his knowledge after the credit report. The process adopted by the Com-

---

[5] LaPierre testified regarding his interview with the field representative as follows: "He said, 'Did you know that she was married to a Puerto Rican?' I said, 'No. . . . When those two women came in, they were white . . . there was no Puerto Rican with her. There was no mention of Puerto Ricans . . . .' "

mission's agents to show illegal discrimination included the field investigator's interview. Although LaPierre was then informed that Cruz was Puerto Rican he had already committed himself to a credit check. A reversal of position by LaPierre at that time would have appeared as an acceptance of the charge of illegal discrimination even if it was in fact otherwise based. The investigator on October 19 agreed that LaPierre should have a stated period to pursue the course he had embarked on. In the circumstances, the Commission, in judging LaPierre's conduct, should include what happened in the stated period.

We do not suggest that adverse information in the report would necessarily point to a finding that the report was the bona fide basis of a refusal to rent,[6] or that there was not illegal discrimination, even prior to October 19. Nor do we suggest that the device of a credit report will be a means for those who wish to discriminate to escape the reasonable implications of discriminatory acts. But there is here a lack of substantial evidence to support an important conclusion.

Although the findings in one aspect were, as stated, unsupported by substantial evidence, inasmuch as discrimination has been shown and it does not appear that it could not be found to be for an illegal reason, the case will be remanded to the Commission.

3. The petitioner argues that the complaints must fail because both the complaints and the Commission's findings assert discrimination based upon national origin and Segundo Cruz, as Puerto Rican, is an American by national origin. General Laws c. 151B, § 4, par. 7 (b), forbids discrimination based upon "race, creed, color, national origin or national ancestry." Implicit in the complaint and the Commission's findings is the fact that the Cruzes were discriminated against because of Segundo Cruz's ancestry. The com-

---

[6] Although LaPierre appears to have excepted to the exclusion of the credit report, in his brief he contends only that it was "within his rights" as a landlord "to protect his real estate investment" and to advise the applicants that their credit references were unsatisfactory. The brief does not assert that the contents of the report were such as to make manifestly inappropriate or improper an order to rent the apartment.

plaints, although carelessly drawn, were sufficient to notify LaPierre of the nature of the charges against him and to bring the issues before the Commission.

The term, "national origin," is a broad one, adequate, unless controlled by the context, to include national ancestry. It has been defined to include national ancestry. See Webster's Third New Intl. Dictionary (1961), 1591. An early use in Federal legislation was in the Immigration Act of 1924 (now repealed). ". . . [N]ational origin shall be ascertained by determining . . . in respect of each geographical area which . . . is to be treated as a separate country . . . the number of inhabitants . . . [of the United States] whose origin *by birth or ancestry* is attributable to such geographical area" (emphasis supplied). 43 Stat. 153, c. 190, § 11 (c), May 26, 1924. New York Consol. Laws, Executive Law, § 292, par. 8, states, "The term 'national origin' shall, for the purposes of this article, include 'ancestry.'" The same definition is used in Administrative Code of the City of New York, § Bl–2.0, par. 8, cited in 11 Race Rel. Rep. No. 1, p. 468. Minnesota State Act Against Discrimination, Minn. Sts. Anno. c. 363.01, subdiv. 6, states: "'National origin' means the place of birth of an individual or any of his lineal ancestors." The Model Anti-Discrimination Act, § 201, (4) (Handbook of the National Conference of Commissioners on Uniform State Laws 1966), provides: "national origin includes the national origin of an ancestor." The Civil Rights Act of 1964 (78 Stat. 241), mentions national origin only. See §§ 201 (a), 202, 401, 601, 701 (b), 703 (title and several paragraphs), 704 (b).

The Act (G. L. c. 151B) has been amended and added to a number of times and in certain aspects lacks precision and verbal consistency. It could not be consistent and reasonable in effect if the terms "national origin" and "national ancestry" are deemed mutually exclusive. Thus in § 4, par. 6 (also dealing with discrimination in renting real estate), the term "national origin" alone is used. Paragraph 8 of the same section, inserted by St. 1965, c. 213, § 2,

makes it unlawful "(1) To refuse to rent commercial space because of . . . national origin . . . . (2) To discriminate . . . because of . . . national origin or national ancestry in the terms . . . of . . . rental . . . . (3) [To make inquiries] . . . concerning the . . . national origin or national ancestry . . . ."

Section 9 of c. 151B, as amended through St. 1965, c. 397, § 7, provides: "The provisions of this chapter shall be construed liberally for the accomplishment of the purposes thereof . . . ." We conclude that the use of the more limited term "national ancestry" in the provisions does not restrict the scope of the preceding term "national origin," and that the complaints state an offence under the statute.

4. The petitioner's brief contends that the proceedings before the Commission were invalidated by the admission of hearsay evidence. The Commission is not bound by the strict rules of evidence and appears to have refrained from making any express findings not based on evidence other than hearsay. In any case, the pertinent evidence was not exclusively or in important part hearsay. *Moran* v. *School Comm. of Littleton,* 317 Mass. 591, 596–597. Compare *Sinclair* v. *Director of the Div. of Employment Security,* 331 Mass. 101, 103. Our disposition of the case makes irrelevant the only hearsay which conceivably may have affected the ultimate findings.[7]

The brief also lays stress on the untrue allegations or implications of Segundo Cruz's own complaint.[8] The in-

[7] The findings make no mention of hearsay evidence of two telephone conversations with a person at LaPierre's home (probably, on all the evidence, LaPierre's mother) which tended to suggest that LaPierre may have been acting in the belief that Cruz was Puerto Rican. In the absence of express subsidiary findings it is speculative whether the Commission improperly gave weight to this testimony in finding No. 12.

[8] "I, Segundo Cruz, residing at 23 Elm Street, Webster, Massachusetts, charge Gerald J. LaPierre, McGregory Road, Sturbridge, Massachusetts, with unlawful discrimination against me in private housing in violation of General Law: (Ter. Ed.) Chapter 151B, Section 4, Paragraph 7, because of my NATIONAL ORIGIN, in that during the week of the 13th October, 1965, my wife and I were picked up by Mrs. Shirley Smitzer [*sic*], who had the keys to an apartment located at 105 Charlton Street, Southbridge, Massachusetts. After seeing the apartment, we went to LaPierre's Mill Works to pay

vestigator having drawn a complaint to be signed by Mrs. Cruz and having reported by telephone to his superior in Boston was told that Cruz himself had to sign a complaint. He then typed the complaint and got Cruz to sign it. The implication of the complaint is that Cruz was with his wife and Mrs. Snitzer in the talk with LaPierre, whereas the evidence was that although he went to the building he did not go inside. It was improper to draw the complaint with such ambiguities and implications. But nothing in it would justify dismissing the complaint or charging Cruz with improper intent. He did not testify and no assumptions as to his comprehension of such a document are justified.

5. The final decree is vacated. A decree shall enter remanding the cause to the Commission for further evidence as indicated in this opinion and findings in the light thereof and an appropriate order.

*So ordered.*

---

a week's rent of $17.00. He said that the apartment was not ready. He stated that he would not take a deposit and also he had to check my credit rating. Mrs. Smitzer [*sic*] stated that my wife was her cousin and she wanted the apartment as soon as it was papered. He informed us that the apartment is $68.00 per month heated, the amount we are now paying for rent. After we left Mr. LaPierre called my sister-in-law who had also inquired about the apartment. He was not aware that they are sisters. My sister-in-law's name is Mrs. John Grzemboski [*sic*]. I, therefore, feel that I have been discriminated against because of my national origin. I have not commenced any action, civil or criminal, based upon the grievance set forth above, except . . . ."