Major J.D. TWENTER, Respondent,

v.

MISSOURI COMMISSION ON HUMAN RIGHTS, Appellant.

No. WD 34913.

Missouri Court of Appeals, Western District.

May 29, 1984.

John Ashcroft, Atty. Gen. and Mary S. Tansey, Asst. Atty. Gen., Jefferson City, for appellant.

Robert J. Dierkes, Columbia, for respondent.

Before SHANGLER, P.J., and KENNEDY and LOWENSTEIN, JJ.

KENNEDY, Judge.

This is an appeal by the Missouri Commission on Human Rights from a judgment of the Cole County Circuit Court which had reversed a decision of the Commission that apartment owner Major J.B. Twenter had engaged in racially discriminatory housing practices, § 213.105(4), RSMo 1978.[1] The Commission decision had awarded to the complainant, Diann Jones, who is black, damages in the sum of $1,750.

Our review is of the Commission decision, rather than of the circuit court judgment, and our task is to determine if it is supported by competent and substantial evidence. § 536.140, RSMo 1978. *Ross v. Robb*, 662 S.W.2d 257, 259 (Mo.banc 1983; *Pulitzer Publishing Company v. Labor and Industrial Relations Commission*, 596 S.W.2d 413, 417 (Mo.banc 1980).

The facts are these:

Complainant Diann Jones testified that she had called Major Twenter on the telephone on the 22nd day of July, 1980, to inquire if he had any apartments for rent. She and her husband lived in Columbia, but they wanted to move to Boonville in the latter part of August. The reason they wanted to move was that her husband, who worked at the training school at Boonville, had lost his driver's license.

Twenter told Mrs. Jones, according to her testimony, that he had two apartments available, one on Third Street and one on Seventh Street in Boonville. He said that he would arrange to meet them and show them the apartments if they would call him when they came to Boonville.

That evening, Mrs. Jones further testified, she and her husband drove to Boonville and called Twenter from a grocery store parking lot. Twenter said that both apartments had been sold since their earlier conversation.

Mr. Jones was not at work on that day, which was a Tuesday, his day off. He learned on his return to the training school on the following day that a man, who proved to be Twenter, had called the training school and had asked to speak with him. When the caller had learned that Jones was not at work, he had asked whether Jones was black or white. He had been informed that Jones was black.

The apartments had in fact not been sold when Twenter told Mrs. Jones on the evening of the 22nd that they had been sold. Both apartments were later rented to other tenants, both white.

Twenter's testimony was in substantial agreement with the testimony of the complainant. He was in the Army, stationed at Ft. Hood, Texas, but happened to be in Boonville when Mrs. Jones called about the apartments. He said with reference to the Third Street Apartment that there was at that time of Mrs. Jones' inquiry on July 22 a deal pending to trade the Third Street duplex where the vacant apartment was located to a group represented by a Mr. Trout. Trout had suggested to Twenter that the vacant apartment be left vacant pending the outcome of negotiations, because if the trade were consummated the apartments would have to be refurbished and rented for more rent than Twenter was getting. Twenter testified that after his first conversation with Diann Jones that he

1. Sec. 213.105 reads in part as follows: "It shall be unlawful: (4) To represent to any person because of race, creed, color, religion, national origin, ancestry, sex, or handicap that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."

had called Trout and that Trout had assured him that the trade was going through. It was on the basis of this assurance from Trout that he had told Mrs. Jones in her second call that the Third Street apartment was sold. Only later, near the end of July, did Twenter learn that the deal had fallen through.

With reference to the Seventh Street apartment, he said that the apartment was actually occupied at the time of Mrs. Jones' telephone calls to him, but that the tenant, Mr. Abele, had notified Twenter's father-in-law (who managed the apartments for him) that he would be vacating the apartment sometime in August to move to Columbia to enter medical school in the fall term. Exactly when the apartment would be vacated was uncertain. His testimony was that he did not tell Mrs. Jones when she called the first time that the second apartment was then available but that it would "possibly become vacant in the future". When she called the second time he told her, he said, that the Seventh Street duplex was "not available for rent." The second call, he said, had been on the evening of the next day, the 23rd, rather than on the same day as the first call, as testified to by Mr. Jones. Twenter acknowledged that he had called the training school to attempt to reach Mr. Jones. He had done so, he said, after he had been assured by Trout that the property exchange was going through, in order to inform Jones that no apartment would be available. He learned that Jones was not at work on that day, and he had asked whether Jones was black or white. His reason for asking that, he explained, was to ascertain if Mr. Jones was a man named Jones whom he had known 20 years and more earlier when he, Twenter, had operated a service station at New Franklin, Missouri. The Jones he had known had been known to him by the nickname of "Popeye" and he did not know his proper first name. The Jones he had known was white, and when he learned that this Jones was black, that settled that he was not Popeye Jones.

### Third Street Apartment.

As to the Third Street apartment, which Twenter had been negotiating to sell, the Commission found it as a fact that he thought at the time of the second telephone call that he had it sold and that it was therefore no longer available for rent. The Commission concluded therefore that the reason he had given was a non-discriminatory reason, and that it was not pretextual.

### Seventh Street Apartment.

The Commission based its decision against Twenter on the Seventh Street apartment. With respect to this apartment we find that the Commission's decision was supported by competent and substantial evidence and we affirm the same.

Taking the evidence which was most favorable to the Commission's decision, and disregarding that which is contrary thereto, *Jarrett v. Hill*, 648 S.W.2d 170, 172 (Mo.App.1983), it is fair to conclude that Twenter told Mrs. Jones in the first conversation that he had two apartments available for rent, one of which would have been the Seventh Street apartment. As the evidence disclosed, the apartment was not vacant at that time but Twenter knew that it would be vacant at about the time Mrs. Jones wanted to move to Boonville. When Mrs. Jones called back that evening, the apartment as a matter of fact was just as available as it had been that morning. Nothing had changed with respect to that apartment. Twenter, though, told Mrs. Jones when she called the second time that both apartments had been sold. With respect to the Seventh Street apartment, this representation was untrue. The Commission concluded that the one fact which had come to Twenter's notice in the interim, which caused him to reverse his position, was Mr. Jones' race. Twenter had learned that Jones was black, after calling the Boonville Training School and making an express inquiry about Jones' race. Twenter's explanation for his inquiry was that he was curious whether this Jones might be his old acquaintance, Popeye Jones. The Commission did not have to accept that

explanation—but if they did accept it, they might still believe that Twenter's knowledge of Jones's race was the reason for his declining to show him and Mrs. Jones the apartment, even though he might have learned it only incidentally.

Upon these facts found by the Commission, supported by substantial evidence, the applicable legal principles point to the Commission's decision. The Commission applied the standards of *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). That case is an employment discrimination case but its principles have been recognized in other cases involving alleged discrimination on the basis of race. *Joplin v. Missouri Commission on Human Rights*, 642 S.W.2d 370 (Mo.App.1982); see also *Wharton v. Knefel*, 562 F.2d 550 (8th Cir.1970); *Howard v. W.P. Bill Atkinson Enterprises*, 412 F.Supp. 610, 612–13 (W.D.Okl.1975); *LaPierre v. Massachusetts Commission Against Discrimination*, 354 Mass. 165, 236 N.E.2d 192 (1968). The principles, as applied to the case before us, are as follows: The plaintiff is required to establish prima facie that, one, complainant is protected by the statute; two, that respondent represented to complainant that he had no apartments available and that such representation was untrue; and three, there was a causal connection between complainant's protected status and the misrepresentation. After the complainant has established a prima facie case of discrimination in violation of the statute, the respondent may set forth a legitimate non-discriminatory reason for its representations. If respondent articulates such a reason, then plaintiff must show that that reason is pretextual in order ultimately to prevail. See *McDonnell Douglas Corporation v. Green*, 411 U.S. at 802, 93 S.Ct. at 1824.

Plaintiff's evidence, accepted by the Commission, establishes a prima facie case of discrimination. Twenter told her, in the second conversation, that the Seventh Street apartment had been sold (according to Mrs. Jones' testimony) or that it was "not available" (according to his testimony). In fact it had not been sold and in fact it was available. (The availability of the apartment, within the meaning of the statute, when Twenter said it was not available, is disputed by Twenter. We take up that argument in the next paragraph.) The only additional factor which had entered the picture since Twenter a few hours earlier had said it was available, was his information that Mr. Jones was black. Thus the Commission could infer, as it did, that it was that factor which had caused Twenter to tell Mrs. Jones that it had been sold or that it was no longer available.

Twenter argues here that the apartment was actually not "available". He points out that it was occupied by Mr. Abele and that Mr. Abele had given no formal notice of his intention to vacate. However, Mr. Abele had told Mr. Hayes (Twenter's father-in-law, who managed the apartments for Twenter) of his intention to vacate the apartment in the latter part of August in order to enter medical school in Columbia. Abele's testimony was that he dealt with Hayes on an informal basis and that no formal notice was required or given. Abele was well-known to Hayes, if not to Twenter. He actually vacated the apartment on August 15. It was in August that Mrs. Jones would need the apartment, as she told Twenter in the first conversation. Twenter's interpretation of the situation when he first spoke with her was that the apartment was available for rental at the time it was needed by her. "Available" under the statute does not necessarily mean "vacant", nor does it mean that the tenant is under a legal obligation to vacate on a certain day. Month-to-month rentals are often handled on a less formal basis, as was the case with Abele's tenancy of the Seventh Street apartment. The Commission was within its discretion in finding that the Seventh Street apartment was "available" on July 22.

Finding as we do that the Commission's decision was supported by competent and substantial evidence, the judgment of the Circuit Court of Cole County is reversed,

and the decision of the Commission is reinstated.

All concur.

