**Thomas BIGGS, d/b/a Timberlake Apartments, Respondent,**

v.

**MISSOURI COMMISSION ON HUMAN RIGHTS, Appellant.**

No. 60342.

Missouri Court of Appeals,
Eastern District,
Division Four.

April 28, 1992.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
May 27, 1992.

William L. Webster, Atty. Gen., Robert V. Franson, Asst. Atty. Gen., Jefferson City, for appellant.

Theresa Counts Burke, Summers, Compton, Wells & Hamburg, St. Louis, for respondent.

AHRENS, Judge.

The Missouri Commission on Human Rights (Commission) appeals from a trial court order modifying the Commission's award of damages to complainant, Teana (Gordon) Generally, in Generally's discrimination complaint against respondent, Thomas Biggs, d/b/a Timberlake Apartments. The trial court affirmed the Commission's ruling that respondent had engaged in discrimination, but reduced the award of out-of-pocket expenses and reversed the award of general damages. Respondent cross-appeals, challenging the trial court's affirmance of the Commission's ruling that he discriminated against complainant on the basis of her race. We affirm.

On August 12, 1988, complainant filed a complaint with the Commission alleging respondent had discriminated against her on the basis of her race by refusing to rent her an apartment. On December 23, 1988, the Commission found probable cause to credit the allegations in the complaint and "endeavor to eliminate the unlawful discriminatory practice complained of by conference, conciliation and persuasion" pursuant to § 213.075.2 RSMo 1986. Such efforts failed, and the cause proceeded to a hearing on February 15, 1990. The following facts were adduced.

The parties stipulated that respondent is an owner of a "dwelling" within the mean-

ing of § 213.010(4) RSMo 1986. The dwelling is an apartment complex containing 412 units. Complainant is African–American.

In June or July of 1988, complainant sought to rent an apartment from respondent. She met with an assistant manager, completed a rental application, and paid for a credit check and security deposit. On her application, complainant indicated she had two female children living with her.

After one or two days, complainant contacted Jane Becker, the manager of the apartment complex. Becker told complainant that since complainant had teenage daughters, Becker was waiting for respondent's approval of the rental application. Complainant contacted Becker a second time to inquire about the application's status. At that time, Becker told complainant that respondent was very particular about the type of tenants he wanted living in the complex, and that he didn't want tenants with "rusted up cars or kids with loud music."

Several days later, Becker told complainant she could not lease her an apartment because of complainant's daughters. Complainant advised Becker her daughters were honor students and active in sports, and suggested that Becker contact the daughters' schools to confirm that the girls were well-known and well-liked. Becker made no effort to contact the schools.

Although Becker had told complainant the rental application was denied, she asked complainant to return to the office and complete utility forms. Complainant completed the forms and telephoned Becker. During this conversation, Becker stated she had contacted the office of Roy Smith Realty, the manager of a residence where complainant had lived six years earlier. Becker testified Mr. Smith informed her that complainant had made several late rental payments and had broken a lease at the residence. At that time, Becker told complainant respondent would not lease to complainant because of the late payments and broken lease. Becker testified Smith told her that the broken lease was not a problem for Smith Realty, that complainant lost her deposit and the company did not

ask for further rent, and that the break was amicable.

Pamela Lesch, a former secretary and bookkeeper at Smith Realty, testified that it was she who spoke to Becker in June or July, 1988, regarding complainant's former residency. Lesch stated Smith had essentially retired, visited the office only periodically, and was out of state during the time in question, although she did not recall for how long. Lesch testified she told Becker that according to the company's rental payment ledger card, complainant was a perfect tenant. Lesch did state the card indicated two of complainant's payments arrived after the due date; however, they were post-marked by the due date, and complainant was not charged a late fee. Lastly, Lesch testified she told Becker the company had experienced no problems with complainant's children. Becker denied having spoken with Lesch, but stated that one of respondent's assistant managers, Margo Leach, had called Lesch for further information on complainant. Lesch denied having spoken to Leach. Becker testified she and Leach reported to respondent what they had learned during their conversations with Smith Realty. Further, Becker stated that during June, 1988, respondent made the final decision on the rental of each unit.

When asked at the hearing to state the reasons why complainant was not leased an apartment, Becker testified that it was because complainant had unsupervised teenage daughters. However, Becker also testified she did not ask complainant what time the children got home from school or whether they were ever home alone, although she did ask complainant what hours she worked. When later asked whether complainant's having two teenage children was the only reason she was not leased an apartment, Becker stated, "[t]hat and perhaps the breaking of the lease was a factor."

Becker further testified that although at the time of complainant's application there were residents with teenage children living at the apartment complex, respondent pre-

ferred not to rent to persons with children.[1] Ms. Becker stated that in 1988, there were no black persons with leases at respondent's apartment complex, although some lessees lived with black persons. Lastly, Becker identified two rental applications made in 1988 by two male Caucasians, Charles Guenther and Daniel Closby. Guenther's application indicated he had two teenage children living with him, while Closby's indicated he had two children living with him, ages 15 and 22. Both applications were approved.

After respondent denied complainant's rental application, complainant moved to a different residence on July 21, 1988. The monthly rent at the new residence is $137.00 more than the monthly rent at respondent's complex. At the time of the hearing, complainant still resided at the new residence.

On June 29, 1990, the hearing examiner issued his findings of fact, conclusions of law, and recommended decision and order, all of which the Commission adopted. The Commission entered an order finding that respondent had violated § 213.040(1) RSMo 1986 by refusing to rent to complainant because of her race. Further, the Commission ordered respondent to (1) cease and desist from using race as a factor in renting apartments; (2) pay complainant actual damages amounting to the difference between the rent at respondent's apartment complex and the rent at complainant's new residence from the date she moved to the new residence to the date of the hearing ($2,466.00 plus nine percent interest from the date the complaint was filed); (3) pay complainant $3,000.00, plus nine percent interest from the date the complaint was filed, for deprivation of civil rights, emotional distress, and humiliation; (4) post a "Discrimination in Housing" poster for one year in the apartment complex's rental office; (5) include the phrase "Equal Opportunity Renter" in advertisements and notices for one year; and (6) maintain records for one year to prove compliance with the Commission's order.

On October 16, 1990, respondent filed a petition for review of the Commission's decision by the circuit court. Both parties filed briefs, and on May 10, 1991, the court issued an order affirming the Commission's finding that the reasons respondent gave for not renting to complainant were pretextual. However, the court ordered that the portion of the Commission's order as to out-of-pocket expenses be remanded to the Commission "to recalculate over that period of time when the lease should have been accepted and until the lease bargained for would have ended." Further, the court reversed the Commission's award of $3,000.00 in general damages, finding "no rationally discernible legal basis" for the award. Both parties appeal.

On appeal from a circuit court judgment in an action for judicial review of an administrative agency decision, an appellate court reviews the findings and decision of the agency, not the judgment of the circuit court. *Reed v. City of Springfield*, 758 S.W.2d 138, 146 (Mo.App.1988). The circuit court's judgment should be affirmed if the court arrived at a correct result. *Id.* Judicial review of the Commission's decisions is governed by chapter 536 RSMo. § 213.085.3 RSMo 1986. The reviewing court is to determine only whether the administrative decision is supported by competent and substantial evidence on the whole record; whether the decision was arbitrary, capricious or unreasonable; or whether the administrative action constituted an abuse of discretion. *Beck v. James*, 793 S.W.2d 416, 417 (Mo.App.1990); § 536.-140.2 RSMo 1986.

In its appeal, the Commission first contends the trial court erred in limiting the award of actual expenses to the duration of a twelve-month lease. The Commission argues there is no evidence to suggest that, had respondent rented to complainant, the lease would have been terminated at the end of the initial lease period. The Commission contends the tenancy would

---

1. We note that in 1988, an amendment to the U.S. Code made it unlawful to refuse to sell or rent a dwelling to any person, after the making of a bona fide offer, because of "familial status." 42 U.S.C.A. § 3604(a) (Supp.1991).

not have ended except for cause, and that respondent's wrong would have continued had respondent refused to renew the lease because of complainant's race.

There is no competent and substantial evidence to support the Commission's award of damages for any period beyond the initial term of the proposed lease. Complainant applied for rental of a unit for a period of one year, "at a monthly rental of $638.00 payable in advance, upon the 1st day of each month, *until the tenancy is legally terminated and possession is surrendered."* (Emphasis added). The proposed tenancy was for a specific period of one year, and absent an additional agreement, complainant's right to possession would have ceased at the end of the one-year period. *See Cook v. Cureatz,* 466 S.W.2d 133, 135 (Mo.App.1971). Respondent cannot be said to have caused complainant's expenses beyond the initial lease period, and it would be improper to speculate whether respondent would have discriminated against complainant if she would have sought a renewal of the lease.

 Next, the Commission contends the trial court erred in reversing the Commission's order requiring respondent to pay complainant $3,000.00 plus interest for "deprivation of civil rights, emotional distress and humiliation." The Commission argues that chapter 213 RSMo permits an award of actual damages, and that the Commission exercised proper discretion in determining the award's amount.

Here, the only evidence of complainant's general damages consisted of her statement that:

I was very distressed. At that time, I was going through a divorce, so I—I needed a place, and I was concerned about my children's emotional stability, as well as my own. So, I was very distressed during that time. And I felt—I felt they were just trying to ignore me, because I—they never would return my calls. I always had to contact them to get a final answer. And they were—

they would not give me a definite answer at the time.

Although in housing discrimination cases actual damages may include damages for deprivation of civil rights, emotional distress, and humiliation, *Id.;* § 213.075.8 RSMo 1986, we find the evidence of complainant's general damages insufficient to support the Commission's award. In making his findings on this point, the hearing examiner[2] relied on *Joplin v. Missouri Comm'n on Human Rights,* 642 S.W.2d 370 (Mo.App.1982), and *Twenter v. Missouri Comm'n on Human Rights,* 671 S.W.2d 429 (Mo.App.1984). Reliance on either case is misplaced.

In *Joplin,* the southern district reversed a trial court judgment which set aside the Commission's award of $500.00 in actual damages to a complainant alleging racial discrimination. *Joplin,* 642 S.W.2d 370. However, because of the respondent landlord's refusal to rent to her, the complainant in *Joplin* had to remain in a rat-infested house with no running water. *Id.* at 375. Further, the court specifically noted the complainant experienced a delay in finding a better place to live. *Id.* The court's finding that the $500.00 award was not unreasonable in that case does not support the $3,000.00 award to complainant here, where the hearing examiner expressly found complainant located a different apartment within a short period of time, and where the only evidence of emotional distress was complainant's testimony concerning the exacerbation of the stress resulting from her divorce. Similarly, the Commissioner's reliance on *Twenter* is inappropriate. Contrary to the hearing examiner's finding, nothing in that case indicates any part of the Commission's award constituted actual damages. *See Twenter,* 671 S.W.2d 429. The case is inapposite, and the Commission's sole point is denied.

 In his cross-appeal, respondent contends the trial court erred in affirming the Commission's finding that he had violated

**2.** As noted earlier, the Commission adopted, *in toto,* the hearing examiner's findings of fact and conclusions of law. In reviewing the examin-

er's findings and conclusions, we are reviewing those of the Commission.

§ 213.040(1) RSMo 1986 by discriminating against complainant on the basis of her race.

 In order to prevail on a claim of discrimination in violation of § 213.040(1), a complainant is required to establish a prima facie case by showing: (1) complainant is protected by the statute; (2) a landlord refused to rent to complainant after complainant made a bona fide offer to rent; and (3) complainant's race was a factor in the landlord's decision not to rent to complainant. *See Twenter*, 671 S.W.2d at 432; *Laclede Cab Co. v. Missouri Comm'n on Human Rights*, 748 S.W.2d 390, 397 (Mo. App.1988). Once the complainant has established a prima facie case, the burden shifts to the landlord to set forth a legitimate, nondiscriminatory reason for the refusal to rent. *See Twenter*, 671 S.W.2d at 432; *Laclede*, 748 S.W.2d at 397. If the landlord articulates such a reason, the complainant must then demonstrate the articulated reason is merely a pretext for discrimination. *See Twenter*, 671 S.W.2d at 432; *Laclede*, 748 S.W.2d at 397. We do not reweigh the evidence, but view the evidence in a light most favorable to the Commission's decision, together with all reasonable inferences therefrom. *Laclede*, 748 S.W.2d at 394.

Respondent contends the hearing examiner made erroneous findings of fact, and then relied on those findings to support certain of its conclusions of law. Respondent specifically attacks three findings. We consider each in turn.

In finding 26, the hearing examiner found:

> At the hearing Manager Becker testified that the reasons [sic] that the Complainant was denied an apartment was, "Because she had two teenage, unsupervised daughters." She did not give any other reason at that time.

Respondent contends the finding is clearly erroneous, because Becker at the hearing gave a second reason for the denial of complainant's application, namely, complainant's late rental payments and broken lease at her former residence.

At the hearing, Becker was asked, "Now, what were the *reasons* why Ms. Gordon [complainant] was denied an apartment at Timberlake?" (Emphasis added). Becker responded, "Because she had two teenage, unsupervised daughters." Later in the questioning, the following exchange occurred:

> Q. [Commission Attorney]: Now, was the fact that Ms. Gordon [complainant] had two teenage children the only factor in your decision not to rent an apartment to Ms. Gordon?
>
> A. (Ms. Becker): That and *perhaps* the breaking of the lease was a factor. (Emphasis added).

We find competent and substantial evidence to support the examiner's finding. As noted above, Becker at the hearing first mentioned only one factor when asked to state why complainant was denied an apartment. Only later did she mention that complainant's breaking of a lease at a prior residence *might* have been an additional factor. Contrary to respondent's interpretation, we do not view the finding that Becker cited only one reason "at that time" to mean she cited only one reason during the course of the entire hearing. Rather, we view the phrase "at that time" to refer to the time at which Becker was first asked to state the reasons for respondent's refusal to rent. The evidence supports the finding.

Further, the finding supports the examiner's conclusion of law that complainant established a prima facie case of discrimination by submitting a number of facts from which it could be concluded that race was a factor in the refusal to rent. As one of four reasons supporting the conclusion that race was such a factor,[3] the examiner noted respondent's "shifting" of explana-

---

3. The other three reasons the examiner cited were: (1) the absence of black lessees in respondent's 412–unit complex; (2) respondent's failure to respond to complainant's inquiries regarding the status of her application; and (3) the fact that a "similarly situated" white male was rented the apartment complainant had sought to rent. Respondent challenges only the third of the three remaining factors.

tions for not renting to complainant. The examiner found:

> During conversations with the Complainant she was given two reasons, her children and the information furnished by the Smith Realty Company. At the hearing the sole reason given was the children. As in the case of the refusal to call the Complainant, this shifting is not by itself evidence of discrimination but it is an additional link of the causal chain between the refusal to rent and Complainant's race.

Despite the statement in the examiner's conclusion that complainant's having children was the "sole" reason Becker gave for respondent's refusal to rent to complainant, it is evident the examiner was cognizant that Becker at the hearing cited two reasons for respondent's refusal. Taken in context of the other conclusions and findings, it is clear the examiner did credit Becker with having cited both reasons at the hearing, but determined that Becker insincerely mentioned the second reason as a mere afterthought. Although unartfully worded, we find competent and substantial evidence to support the examiner's conclusion that Becker at the hearing essentially abandoned the second reason she had earlier given complainant for respondent's refusal to rent. Further, we find competent and substantial evidence that such abandonment evidenced a "shifting" of explanations sufficient to consider in determining whether race was a factor in respondent's refusal.

Next, respondent challenges two of the examiner's findings concerning Becker's conversation with Smith Realty regarding complainant's former residency. In finding 32, the examiner found Becker testified that *after* receiving information from one of respondent's assistant managers who had telephoned Pamela Lesch of Smith Realty, Becker telephoned Roy Smith. In finding 33, the examiner noted that Becker's testimony on this point was inconsistent, because it was "unclear why, if she [Becker] had been advised by Assistant Manager Leach that the Complainant was a perfect tenant, she would have called back

and spoken to Mr. Smith for additional information."

At the hearing, the following colloquy occurred with respect to this issue.

Q. [Respondent's Attorney] All right. I'm going to ask you again, did you ever speak to Ms. Lesch?

A. [Ms. Becker] Not that I remember, no.

Q. Do you know if anyone in your office spoke to Ms. Lesch?

A. Yes.

Q. And who would that have been?

A. Margo Leach.

Q. And did Margo Leach provide the information to you that she gained from talking to Ms. Lesch?

A. Yes.

Q. Did you have a conversation with Mr. Smith?

A. I think so. I—it's what he said he was.

Q. All right, you—you don't know Mr. Smith?

A. No, I don't.

Q. And you hadn't talked to him before?

A. No.

Q. Did you call him at Roy H. Smith Realty Company?

A. Yes, I did.

Q. And the information he gave you is what you testified to, is that correct?

A. Yes.

Q. And you relied on whoever you spoke to for that information, is that correct?

A. Yes.

■■■■ On this point, it is important to note that it is the function of the administrative agency, and not the reviewing court, to determine the witnesses' credibility. *Edmonds v. McNeal*, 596 S.W.2d 403, 408 (Mo. banc 1980). Further, if the evidence before the agency warrants either of two opposed findings, we are bound by the findings of the agency. *Id.* Here, the examiner credited Lesch's testimony with regard to the conversation with Becker. Specifically, the examiner found that while Becker "forgot much," Lesch testified

clearly and concisely and demonstrated an ability to remember details. Further, the examiner found that Lesch was a "totally disinterested witness." We defer to the examiner's findings in this regard.

Although the dialogue between Becker and respondent's attorney does not specifically reference a time period, it was reasonable for the examiner to have believed Becker was relating events in chronological order, and that, therefore, Becker engaged in the alleged conversation with Mr. Smith after Leach had spoken with Smith Realty. It was within the examiner's discretion to disbelieve Becker's later testimony, upon questioning by the examiner himself, that her conversation with Smith occurred prior to Leach's alleged conversation with Lesch. We find competent and substantial evidence to support the examiner's findings.

Next, respondent challenges another of the four reasons the hearing examiner cited in support of his conclusion that complainant had established a prima facie case of discrimination.[4] In support of his conclusion, the examiner found that after complainant's rental application was rejected, the apartment she sought to rent was rented to Donald Closby, a white male who was "similarly situated." Respondent contends Closby was not "similarly situated," since neither of Closby's children lived with him and one was an adult.

Although we question the examiner's parenthetical finding that Closby was similarly situated even if he had only one teenager who visited him, we find substantial and competent evidence to support the examiner's general finding that Closby was similarly situated.

Although complainant's application did not list the ages of her children, the record indicates Becker knew their ages prior to the denial of complainant's application. The children were ages 15 and 17 at the time of the hearing, which was held less than two years after complainant's application was denied. Similarly, Closby's application for rental of a unit in respondent's apartment complex indicated two children were to live with him, ages 15 and 22.

Therefore, regardless of any subsequent change in the living arrangements of Closby's children, there is competent and substantial evidence to conclude that Closby and complainant were similarly situated at the time of their applications. Taken together with the other factors the examiner cites in support of his conclusion that race was a factor in respondent's refusal to rent to complainant, the record supports the examiner's finding that complainant established a prima facie case of discrimination.

Lastly, respondent challenges the examiner's finding that the legitimate, non-discriminatory reasons he articulated were actually a pretext for discrimination against complainant. The examiner found that respondent satisfied his burden to articulate such reasons by stating he refused to rent to complainant because: (1) complainant had two teenage, unsupervised daughters; and (2) complainant had made late rental payments and broken a lease at a former residence. Respondent contests the examiner's finding that both articulated reasons were pretextual. In finding the reason concerning complainant's children pretextual, the examiner concluded:

> It is clear that applicants who were caucasian and had children were rented apartments both before and after June 1988. Although the Respondent stated its concern was non-supervised teenagers, they [sic] made no attempt to determine if or for how long the Complainant's daughters would be unsupervised. If the Respondent's concern was directed at unruly teenagers, the Respondent made no effort to contact the daughters' school, as the Complainant suggested and authorized. In addition, the credited evidence shows that manager Becker was advised by the employee of Smith Realty that the children had caused no trouble in the past.

In arguing this finding was erroneous, respondent merely repeats his argument that Closby, the person who rented the apartment complainant had sought to rent, was not "similarly situated." We will not

4. See footnote 1.

readdress that argument here. Respondent does not respond to the examiner's broader reference to other Caucasian applicants to whom respondent rented apartments, despite their having children. Further, respondent does not respond to the examiner's findings regarding respondent's failure to determine whether complainant's children were unsupervised or unruly, nor does he respond to the examiner's reference to the information Becker acknowledges she received from Smith Realty. We find ample evidence in the record to support the examiner's conclusion that the respondent's articulated reason with respect to complainant's children was pretextual.

Similarly, there is competent and substantial evidence to support the examiner's finding that the reason respondent stated with respect to complainant's prior residency was pretextual. In making its finding, the examiner stated:

> At the hearing the Respondent did not rely on Complainant's alleged history of late rental payments and breaking of a lease as a basis for its refusal to rent. Yet in June 1988 this was a reason furnished to the Complainant. The evidence shows this to be pretextual also. Credited evidence shows that an employee of Smith told representatives of Respondent that the Complainant was a perfect tenant. Manager Becker admitted that the breaking of the lease had been amicable and that she was aware of that fact. It had occurred six years previously. I conclude that the reasons furnished by Manager Becker to the Complainant relating to her payment history with Smith were pretextual. I also consider the fact that Becker verbally advised Complainant that this was a reason and then abandoned that reason at the hearing to be evidence of an effort to hide the real reason for its action.

Again, in making his argument, respondent merely repeats his contention that, contrary to the examiner's findings, Becker at the hearing did state that complainant's rental history with Smith Realty was a factor in respondent's refusal to rent to complainant. We have fully addressed this argument and will not do so again at this juncture. Competent and substantial evidence supports the examiner's finding that respondent's reason with respect to complainant's prior rental history was actually a pretext for discrimination. Respondent's sole point is denied.

The judgment of the trial court is affirmed.

SMITH, P.J., and KAROHL, J., concur.