ST. LOUIS COUNTY, Missouri,
Plaintiff-Appellant,

v.

Alvin BROOKS et al.,
Defendant-Respondent.

No. 41823.

Missouri Court of Appeals,
Eastern District,
Division Four.

March 24, 1981.

Thomas C. Wehrle, County Counselor, Karen C. Moculeski, Asst. County Counselor, Clayton, for plaintiff-appellant.

John Ashcroft, Atty. Gen., Gregory W. Schroeder, Asst. Atty. Gen., Jefferson City, for defendant-respondent.

SIMON, Judge.

St. Louis County (County) appeals from a judgment of the Circuit Court of St. Louis County affirming a decision of the Missouri Commission on Human Rights (Commission). The Commission found that the County had engaged in an unlawful employment practice as defined in § 296.020

RSMo 1969 [1] in its discharge of Ron R. Greeley, a former employee, and thus the Commission found that race was a significant factor in the County's decision to terminate him. We reverse.

On appeal, the County contends (1) the Commission's decision was not supported by competent and substantial evidence on the record as a whole; (2) the decision and action of the Commission was not made pursuant to the procedure specified in Chapter 296; and (3) the Commission did not have jurisdiction to hold a hearing in the present action in that there was not a prompt investigation made and an immediate endeavor to hear the complaint.

The complainant, Ron R. Greeley (Greeley), is a black male who was hired in September 1970 to direct the Public Service Careers Program (PSCP) within the St. Louis County Government. The PSCP was a federally funded program designed to place "hard core" unemployed in positions in county government. Greeley was previously employed with the Human Development Corporation as a job developer, and had prior work experience in the job training and development field. He was hired by Paul Epps (Epps), then Director of the Office Manpower Programs for St. Louis County. Epps was Greeley's supervisor throughout Greeley's tenure as director of the PSCP.

At the Commission hearing, Epps testified that when he hired Greeley, Greeley had an outstanding success record in placing individuals in employment, particularly those persons who are minorities, ex-offenders, or other difficult persons to place. Also, that when he hired Greeley he knew of no other blacks in supervisory positions within the administrative section of St. Louis County government, except perhaps for one employed as an administrative assistant in the Division of Parks and Recreation.

Further, Epps testified that the fact that there were only a few blacks in county government caused Greeley problems in working with other white administrators. Epps also stated that because of the objectives of the PSCP program, which were to employ minorities and other "hard core" unemployed, and because Greeley was black, those circumstances could explain some of the difficulties and resistance which were encountered from other department heads and administrators in St. Louis County government. Epps related that at the time the program was started his immediate supervisor was Mr. Gray, the Director of the Department of Administration who referred to the PSCP programs as Epps' "nigger program."

Late in 1971, Epps received as a subordinate, Dick Murray (Murray), a white male, who was transferred from another position within St. Louis County government to head the Public Employment Program (PEP), another federally funded program.

Epps supervised both Greeley's PSCP program and Murray's PEP program. At the hearing Epps testified that although Greeley and Murray were in charge of separate programs, there was some overlapping in function and from the very beginning there was some "healthy competition" and friction between Greeley and Murray.

Sometime in January of 1972, Murray became concerned that perhaps some participants in the PEP program were not residing in St. Louis County, which was one of the qualifications of employment under the

---

1. All statutory references will be to RSMo 1969 unless otherwise noted.

Section 296.020 provides in part:
It shall be an unlawful employment practice:
(1) For an employer, because of the race, creed, color, religion, national origin, sex or ancestry of any individual:
(a) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, creed, color, religion, national origin, sex or ancestry; or
(b) To limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, creed, color, religion, national origin, sex, or ancestry.

program. Murray observed that some of the applicants had used Greeley's St. Louis County address on their PEP participant applications. It was Murray's suspicion that Greeley was using his own address in order to qualify these people for employment within St. Louis County government. When Murray brought the matter to Epps' attention, Epps did not view it with the same alarm as did Murray. However, Epps did assure Murray that he would investigate the matter. Murray, not content in letting Epps handle the matter, went to Greeley's office on February 1, 1972 and confronted Greeley with his suspicions. A physical altercation occurred between the two men. There were no witnesses to the altercation.

The testimony was conflicting as to how the physical altercation developed. Greeley testified that Murray called him racially derogatory names while accusing him of falsifying records. He testified that he felt intimidated and that when he rose from his desk to leave the room, Murray shoved him. Greeley stated that he responded by hitting Murray with his fists and that after knocking Murray to the ground, it was possible that he kicked Murray but he did not recall.

Murray denied calling Greeley any racially derogatory names and denied shoving him, denied hitting Greeley at any time during the incident. Murray's account of the incident was that Greeley became angry, came around the desk and proceeded to hit Murray several times which caused Murray to fall to the floor. It was Murray's testimony that Greeley continued to kick him while he was on the floor. When the altercation was over, Murray went to clean up. Greeley went to lunch.

As Murray was returning to his office he met Epps. Epps stated that when Murray came to him, Murray's nose was swollen and bleeding, his clothes were dirty and rumpled, and there were footprint marks on the back of Murray's suit. In response to Epps' inquiry as to what had happened, Murray stated that he had been hit and kicked by Greeley without provocation. Immediately after telling Epps what had happened, Murray left the building to seek medical attention for a broken nose.

Having concluded the incident was a serious physical altercation, Epps went to Mr. Baer's office and related what Murray had told him of the incident. Mr. Baer (Baer) was the executive assistant to Mr. Roos, the County Supervisor at that time and Epps' immediate supervisor. Epps suggested that both men be suspended pending further investigation into the matter. No decision was made at that time, since Baer wanted to consult with Mr. Roos.

When Greeley returned to the building later that same afternoon, Epps went to his office to get his side of the story. Greeley admitted hitting Murray following a verbal dispute. Greeley stated that the dispute was precipitated with Murray's accusations of wrongdoing regarding the PEP applications. At the time, Greeley did not allege that he had been called any racially derogatory names, nor did he indicate that Murray had precipitated the fight by shoving him.

The following day Epps met personally with Baer and again suggested that both men be suspended. However, Baer informed him that Greeley would have to be terminated. When asked by Baer if Murray should be terminated as well, Epps responded that Murray apparently had not been the aggressor, that he was the injured party, and that a suspension would probably be sufficient.

Epps handled the matter by giving Greeley the option of submitting a resignation or being terminated. He assured Greeley that if he resigned he would do everything possible to set up another job for him. Greeley signed a letter of resignation which had been prepared by Epps. When the job did not materialize, Greeley felt that he had been unfairly pressured. He attempted to withdraw the resignation, and was unable to do so. He then filed a complaint with the Commission alleging that he had been the victim of racial discrimination.

Murray, on the other hand, was not fired or suspended, nor was an official reprimand entered into his personal file. He was informally reprimanded for taking the matter into his own hands.

Greeley filed a complaint with the Missouri Commission on Human Rights in March of 1972. The Commission rendered its decision on July 13, 1978, finding that Greeley had been unlawfully discriminated against by the County, and awarded him back pay through December of 1974. The Commission made specific "Findings of Fact" and "Conclusions of Law." The Commission's decision was affirmed by the St. Louis County Circuit Court on June 6, 1979. This appeal followed.

Section 296.050 provides that judicial review of an action by the Missouri Commission on Human Rights shall be in a manner provided in Chapter 536 RSMo, which contains the general provisions for administrative procedure and review. Section 536.140 RSMo 1978 permits judicial inquiry to extend to a determination of whether the action of the agency is supported by competent and substantial evidence upon the whole record.

■ Fundamentally, in conducting our review, we shall not reweigh the evidence, but shall review the evidence in its entirety in the light most favorable to the Commission's decision, together with all reasonable inferences therefrom. *Abbott v. Civil Service Commission of the City of St. Louis*, 546 S.W.2d 36, 37 (Mo.App.1976).

The Commission's "Conclusions of Law" indicate that the Commission specifically found that whoever made the decision to terminate Greeley did so on their belief that he was the aggressor in a serious physical confrontation. The Commission also found that Greeley did seriously injure Murray, and that such behavior would have justified discipline. However, the Commission concluded "that race was a significant factor in the decision to terminate Greeley rather than discipline him in some other manner." The basis for the Commission's decision therefore was that the County was discriminatory in the manner of discipline it chose to adopt. The question then is whether there is competent and substantial evidence on the whole record to support this finding.

In the Commission's conclusion of law numbered 3,[2] the Commission stated:

"Therefore, their (Baer and Epps) normal inclination would be to go to all reasonable lengths to retain him (Greeley) in the program. We have also concluded that another similar incident involving a white person did not result in a termination: therefore, we conclude that it would be reasonable not to terminate the participants in this altercation. In absence of evidence distinguishing the prior situation, and particularly in view of Baer and Epps' usual support of Greeley, we can only conclude that his race was a factor in the termination."

■ We are constrained to hold that the ultimate conclusion, that race was a factor, is not supported by substantial and competent evidence. Initially, the Commission concludes that if Baer and Epps are long-time friends and supporters of Greeley they would go to all reasonable lengths to retain him. Then, in a syllogistic manner, the Commission attempts to build a bridge of logic between that conclusion and its ultimate conclusion by concluding that another similar incident involving a white person did not result in termination, and therefore, because the other similar incident did not result in a termination, it was unreasonable for the County, through Baer and Epps, to terminate Greeley. Further, the Commission concluded that there was no evidence distinguishing the prior incident from the incident presented herein.

**2.** "3. We conclude that race was a significant factor in the decision to terminate complainant, rather than discipline him in some other manner. We have concluded that both Baer and Epps were long-time friends of Greeley, supported his ambition to rise in St. Louis County Government, and that both of them knew he had been a valuable employee in the program. Therefore, their normal inclination would be to go to all reasonable lengths to retain him in the program. We have also concluded that another similar incident involving a white person did not result in termination: therefore, we conclude that it would be reasonable not to terminate the participants in this altercation. In the absence of evidence distinguishing the prior situation, and particularly in view of Baer and Epps' usual support of Greeley, we can only conclude that his race was a factor in the termination."

The keystone to this reasoning is the conclusion that there was a prior similar incident involving two white employees which did not result in termination. This keystone conclusion is incorrect because it rests upon a finding of fact which is not supported by the evidence. Thus, the keystone falls and the Commission's reasoning falls with it.

The unsupported finding of fact is number 15.[3] The Commission found that "on one prior occasion in St. Louis County Government, a physical altercation occurred between two white employees, one of them a unit supervisor, as a result of which no one was fired or forced to resign", has no support in the record. The reference in the record to this finding of fact, is the testimony of Epps which, in pertinent part, was as follows:

Q Do you know of any other time when County employees had gotten involved in physical fights, do you know of any other?

MR. EPPS: One other incident that involved a department head and one of his subordinates. I don't have the documentation on this of course as to the time and place and so forth, but one of the—

\* \* \* \* \* \*

MS. WHITLEY: My question was, Mr. Epps, do you know personally of any other time County employees were involved in a physical fight?

A Yes, and there was an incident in this very building involving a department head—let me correct that, not a department head, a unit head within the Department of Revenue.

Q Was the Department Head white or black?

A White.

Q And do you know of personal knowledge how that was handled at that time?

A No I don't.

Q Do you know whether that white department head was fired?

A He was not fired, no.

It is obvious the evidence does not support the finding. The evidence only indicates the race of the department head, and that he was not fired. Further, the evidence does not indicate what disposition was made as to the other participant, whether he or the unit head was the aggressor and if any serious injury resulted therefrom, or the nature of the altercation. The Commission merely assumed that one of the participants was the aggressor, which is reasonable, but then obviously further assumed that the other participant was white also, and that the white unit head was the aggressor and was not terminated. The assumptions are invalid and cannot be reasonably inferred from the evidence contained in the record.

■ In proceeding under Title VII (42 U.S.C. §§ 2000e et seq.), an allegation of discriminatory discharge, the complaining party has the obligation of establishing a prima facie case of racial discrimination motivating his discharge. Once that is accomplished, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for his action. If the employer is able to do so, the complainant must be given the opportunity to demonstrate that the employer's stated reason is actually a pretext for discrimination. *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

The respondent suggests that we use this same approach in resolving an action taken

3. "15. On one prior occasion in St. Louis County Government, a physical altercation occurred between two white employees, one of them a unit supervisor, as a result of which no one was fired or forced to resign. There is no evidence in the record as to what the discipline in that case was, and there is no evidence as to what those in a position to discipline believed in regard to the seriousness of that incident or in regard to who was the aggressor. Since this incident was known outside that department, it is reasonable to assume, and we find that it was believed to be, a serious incident. It is also reasonable to assume, and we find on the basis of common knowledge concerning fights, that one of the parties involved was believed to be an aggressor."

pursuant to Chapter 296 since its provisions are comparable to the provisions in Title VII. Respondent argues that it had established a prima facie case and that the county did not overcome its burden of proving that the apparent unlawful discharge was actually based upon some legitimate, non-discriminatory basis. We do not agree.

Even if we were to follow the approach of Title VII cases, and find that respondent had made a prima facie case, we also find that the county had met its burden of showing a legitimate, non-discriminatory reason for the discharge. We also feel that respondent had not met its burden of showing that the legitimate reason given by the county was mere pretext.

In McDonnell Douglas Corporation v. Green, supra, the United States Supreme Court was dealing with a former employee of the defendant corporation who, as a civil rights leader, had engaged in an illegal "stall in" designed to tie up access to and egress from his former employer's plant at the peak of traffic hour. Subsequent to the unlawful activity, the plaintiff sought to be rehired by the defendant but was denied employment on account of his participation in the "stall in." Plaintiff had alleged that the defendant had violated § 703(a)(1) of Title VII by discriminating against him on the basis of his civil rights activities. The Court held there was no Title VII violation because an employer has a right not to hire anyone who engages in illegal conduct towards it, and thus the defendant had stated a valid reason for its actions. The Court further stated that on remand, the plaintiff should be given a fair opportunity to show that the defendant's stated reasons were but a pretext for racial discrimination. Although there may have been many potential ways to do this, the Court at 411 U.S. 803, 93 S.Ct. 1825 stated that:

> Especially relevant to such a showing would be evidence that white employees involved in acts against petitioner of comparable seriousness to the "stall in" were nevertheless retained or rehired.

4. In the General Motors case, the court expressly declined to decide the question of whether the principles of Title VII cases or any other federal cases apply to the agency action

In General Motors Corporation v. Fair Employment Practices Division, etc., 574 S.W.2d 394 (Mo. banc 1978), a black probationary employee of General Motors was terminated for poor job performance on his first day on the job. He filed a complaint with the Fair Employment Practices Division charging racial discrimination under a St. Louis City ordinance. The Division's finding of discriminatory employment practices was reversed by the Circuit Court of the City of St. Louis. Our Supreme Court affirmed the circuit court's order of reversal concluding there was no substantial evidence on the whole record to support the Division's determination. In assuming (but not deciding) that a prima facie case of discrimination had been made, the court held that evidence produced by the employer clearly overcame the prima facie showing with evidence of complainant's unfitness for the position.[4] Fatal to the complainant's case was that "complainant offered no evidence that other probationary employees, black or white, who were terminated on the stated ground of improper job performance, had been given more training or more time to demonstrate ability." Id. 574 S.W.2d at 399.

In the present case any evidence of a prima facie showing of discrimination was rebutted by evidence that the County had a legitimate non-discriminatory reason for terminating Greeley. As we have already indicated, the complainant failed to establish that similarly situated white employees were treated differently. In the absence of sufficient evidence to establish this, the decision of the Commission must fall. For this reason, we reverse and, as a result of our ruling on this point, it is not necessary to consider the other points raised by the County.

Reversed.

SMITH, P. J., and SATZ, J., concur.

in that case. Instead the court followed the approach enunciated in the Green case "arguendo."