**LACLEDE CAB COMPANY,**
**Plaintiff–Appellant,**

v.

**MISSOURI COMMISSION ON HUMAN RIGHTS, et al., Defendant–Respondent.**

No. 53343.

Missouri Court of Appeals,
Eastern District,
Division Three.

March 8, 1988.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 15, 1988.

Mark F. Haywood, John T. Murphy, Jr., St. Louis, for plaintiff-appellant.

Nina Hazelton, Asst. Atty. Gen., Jefferson City, for defendant-respondent.

KAROHL, Presiding Judge.

Laclede Cab Company (Laclede) appeals from a judgment of the Circuit Court affirming a decision of the Missouri Commission on Human Rights (Commission). The Commission found that Laclede had discriminated against Matthew Williams, the complainant before the Commission, in violation of Section 296.020(1)(1)(a) RSMo 1978, when it refused to consider his job application to become a taxicab driver because of his handicap, an amputated left hand. The Commission's order enjoined Laclede from discriminating against job applicants on the basis of handicap, required

the company to hire Williams as a taxicab driver and ordered Laclede to pay Williams backpay in the amount of $69,030.89. We affirm in part and reverse in part and remand with instructions.

On appeal, Laclede contends the trial court erred by affirming the Commission's finding of handicap discrimination and awarding of backpay in that neither was based upon competent and substantial evidence on the record as a whole. Laclede further contends that the backpay award to complainant was arbitrary and capricious.

## FACTS

On December 11, 1981, in response to a newspaper advertisement, Matthew Williams applied for a position as a cab driver with the Laclede Cab Company. However, he was not allowed to complete the application process. As he began to take the examination, a company supervisor, later identified as Vernon Jones, took the exam and application from him. Williams was told that Laclede could not hire an amputee without losing its insurance coverage. Williams was not asked any questions about his qualifications, was not interviewed, and was not allowed to complete his application.

In 1981, the Laclede Cab Company operated a taxicab service in the metropolitan St. Louis area. Its taxicab drivers were required to (1) convey customers using a vehicle equipped with automatic transmission; (2) drive the vehicle while operating a two-way radio located to the right of the steering wheel; and, (3) lift and deliver packages varying in size and weight from an envelope to an object weighing in excess of 105 pounds.

Prior to the date Williams applied for a job with Laclede his left hand had been amputated just above the wrist. He owned a prosthesis but it was not in working order when he sought employment. However, he could operate an automobile equipped with automatic transmission without the use of his prosthesis. Also at the time of his application, he had a driver's license but did not have a chauffeur's license. He obtained a chauffeur's license

without restrictions subsequent to the date of his application.

Williams moved to the St. Louis area in early 1981. Following his amputation in 1972, he held jobs which entailed driving tractors and trucks, and lifting large objects without assistance.

Throughout 1981, there were daily openings for taxicab drivers with Laclede. As part of the application process, applicants were required to complete an application and take a short written exam which tested their knowledge of the St. Louis area. Applicants were also required to possess a chauffeur's and taxicab license before they could begin working for Laclede.

Taxicab licenses are issued by the Department of Streets for the City of St. Louis. As a prerequisite to issuance of a taxicab license, a driver must have been offered employment by a taxicab company. The City of St. Louis imposes no restrictions on amputees obtaining taxicab licenses.

Dale Hester, a non-handicapped individual, testified at the hearing. He was hired by Laclede in 1980 as a cab driver. When he applied for the job he did not have a driver's license, chauffeur's license or taxicab license. Hester stated that Vernon Jones accompanied him to various offices the day after he was hired and helped him obtain the necessary licenses.

Hester's brother, Reginald Hester, also non-handicapped, testified that when he applied with Laclede in 1982 he had difficulty answering questions on the exam. Gerald Standley, Laclede's President in 1982, allowed Hester to drive around St. Louis and locate buildings questioned on the exam before he turned it in to be graded.

Based on this testimony, and the demeanor and interests of the witnesses, the hearing examiner found that complainant was not allowed to complete Laclede's application process and was never considered for employment with Laclede because of his physical disability.

Testimony was elicited by an investigator for the Commission, Phyllis Harden, to the effect that both Laclede's President, Gerald

Standley, and General Manager, Elmer Schuster, told her that complainant was not hired because he had only one hand and because hiring a handicapped driver would make it difficult to obtain insurance coverage. The fact that Williams did not complete the exam was an additional reason given to Harden for Laclede's failure to hire him.

In response to the inference that complainant could not competently operate a motor vehicle, Carla Baum, Director of Therapies at St. Mary on the Mount Rehabilitation Center, testified. She previously had evaluated complainant's driving ability during a 45–50 minute drive in St. Louis morning rush hour traffic. Her evaluation indicated that Williams was "able to successfully operate an automatic transmission car with no adaptations required. He used the left stump to safely control the car with assistance of the right hand." She also noted that complainant maintained control of the car while operating the radio and defroster with his right hand.

Additionally, in 1981, a device called an "amputee spinner" was available for use by hand amputees. The device cost $46 and was mounted on the automobile steering wheel. The spinner could be installed in about five minutes.

In order to operate a taxicab service in the City of St. Louis, Laclede was required to carry liability insurance. George Heckman, President of Laclede's insurer, testified that the decision to insure a cab company was determined following consideration of 1) the claim record of the risk [Laclede] over the last three years, 2) the condition of the risk's [Laclede's] vehicles, and 3) the drivers' driving records, including their physical condition. Heckman believed that any serious impairment of a taxicab driver—i.e., having only one eye, a history of heart attacks, and epilepsy—would seriously impair, if not jeopardize, the taxicab company's insurance because such a driver would place an undue hazard on the company. According to Heckman, any serious impairment would cause a risk to go to a specialty company for insurance. He did not testify insurance was not avail-

able or that the cost of insurance would be prohibitively expensive, i.e., so expensive as to defeat the profit motive of Laclede.

Based upon all of the above, the hearing examiner concluded that Williams had a physical impairment which resulted in a disability because it substantially limited a major life activity—i.e., his employability. Moreover, the examiner noted that while a chauffeur's license and taxicab license were prerequisites to employment, they were not a qualification for being offered employment. The examiner concluded that complainant made a prima facie case of handicap discrimination and that Laclede failed to articulate a legitimate non-discriminatory reason for refusing to hire Matthew Williams. Consequently it ordered, inter alia, Williams be hired as a driver for Laclede and awarded him backpay. The Commission adopted the hearing examiner's findings and recommendations on April 21, 1986. Laclede Cab filed a timely Chapter 536 petition for review in the Circuit Court. On May 19, 1987, the court affirmed the decision of the Commission. Laclede appeals.

### STANDARD OF REVIEW FOR SECTION 296.020 RSMO 1978 PROCEEDINGS

■ Our review is limited to the findings of the Commission and not the determination made in the circuit court. Pursuant thereto, we note that Missouri courts have adopted federal standards enunciated in suits involving claimed under Title VII violations of the Civil Rights Act of 1964. *Midstate Oil Company, Inc. v. Missouri Commission on Human Rights*, 679 S.W. 2d 842, 845–466 (Mo. banc 1984). The complaining party must first establish a *prima facie* case of discrimination under the statute. The burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. If the employer succeeds in this endeavor the complaining party must demonstrate that the employer's stated reason is in actuality a pretext for discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *County*

*of St. Louis v. Brooks*, 614 S.W.2d 283, 287[3] (Mo.App.1981). With reference to the proof by complainant and by employer, the test is whether the decision is supported by substantial evidence, not merely that there is some evidence to support the Commission's decision. The Commission's findings must be supported by competent and substantial evidence based upon the entire record; not be arbitrary, capricious or unreasonable; not amount to an abuse of discretion; and, not be unauthorized by law for any reason, including those listed in Section 536.140(2) RSMo 1986. *Kansas City v. Missouri Commission on Human Rights*, 632 S.W.2d 488, 490[1, 2] (Mo. banc 1982). Fundamental to our analysis is the dictate that we shall not reweigh the evidence but shall view the evidence in its entirety in the light most favorable to the Commission's decision, together with all reasonable inferences therefrom. *Cherokee Tobacco & Candy Company v. Civil Rights Enforcement Agency*, 662 S.W.2d 919, 920 (Mo.App.1983); *County of St. Louis v. Brooks*, 614 S.W.2d at 286[1].

## BACKGROUND ANALYSIS

There is a common thread to the approaches taken by fact finders when handling a disparate treatment case. Although not expressly delineated as such, these opinions can be broken down into a two-phase inquiry. The first phase is objective and typically arises in claims of handicap discrimination[1] wherein the employer raises the issue that complainant was not considered for employment because his handicap precludes him from doing the job. The employee or prospective employee then bears the burden of rebutting the presumption of inability to perform. For instance, a double-amputee of the hands presumably could not perform and would be totally unable to do a job which required pole climbing ability. The complainant, once the issue has been injected by the employer, bears the burden of proving he is capable of doing the work. In the absence of proof of this character the complaining party cannot establish a *prima facie* case.

If complainant's burden is met, i.e., apart from his handicap he can do the job but he was not permitted to do so, or if no objective or phase-one issue is raised, then the second and more difficult phase must be addressed. In this phase the issue is whether the employer *subjectively* considered one of the factors proscribed by Chapter 296[2] when the alleged disparate treatment occurred. Complainant bears the burden of showing that employer subjectively committed a prohibited employment practice.

While the objective decision will be addressed only in those instances where a complainant's status under a Chapter 296 protected class raises a question that he may be totally unable to perform a job, the second analysis will more frequently be the primary focus of inquiry. Herein is where most disparate treatment cases fall—i.e., there is a claim that an individual, *due to* his race, creed, color, religion, national origin, sex, ancestry or handicap was subjectively discriminated against by his employer.

Ultimately the fact-finder must decide whether both elements or phases have been satisfied. In cases where inability to do the job is injected as an issue, complainant must first establish by a preponderance of the evidence that he is objectively qualified

---

1. The issue could also arise in cases where it is alleged that the disparate treatment is gender-related. We focus on handicap and gender because these factors are conducive to employer claims that certain characteristics of such individuals render them totally unable to perform the particular job at issue. Hence, when these individuals are not considered for employment no prohibited discrimination occurs. It will be rare when the other characteristics listed in Section 296.020(1) RSMo 1978 will be similarly at issue.

2. Chapter 296, RSMo 1978 was repealed and reenacted as Chapter 213 RSMo 1986. As applied to this case, Section 296.020 RSMo 1978 makes it an unlawful employment practice for an employer to discriminate on the basis of race, creed, color, religion, national origin, sex, ancestry, or handicap of any individual.

to do the job.[3] If complainant fails to sustain this burden, the inquiry ends. However, if complainant can offer evidence that would support a finding of objective capability[4] or if his classification is one not conducive to the objective analysis,[5] he then bears the more difficult burden of showing subjective discrimination.[6] We

**3.** Cases where the first prong was not met include: *Midstate Oil v. Missouri Commission on Human Rights*, 679 S.W.2d 842 (Mo. banc 1984) (Complainant's pregnancy, by her own admission, precluded her from doing the heavy lifting required by her job); *Missouri Commission on Human Rights v. Southwestern Bell Telephone*, 699 S.W.2d 75 (Mo.App.1985) (Obese woman with high blood pressure who did not seek medical treatment for her condition did not overcome burden of proving she could otherwise perform her job); *Doe v. New York University*, 666 F.2d 761 (2d Cir.1981) (Complainant with "borderline personality" did not present sufficient evidence that despite her handicap she could endure the rigors and pressures of medical school and otherwise handle the work required).

**4.** *See, e.g., E.E. Black, Ltd. v. Marshall*, 497 F.Supp. 1088 (D.Haw.1980) (Prospective job applicant [laborer] who was denied employment because of a back problem proved he was "qualified" and capable of doing the job required).

**5.** Typically, a person's race, creed, color, national origin or ancestry will not render the individual totally unable to perform a particular job. Similarly, only in rare instances will a person's religion render him incapable of objectively doing a job. See footnote 1, *supra*.

**6.** *See, e.g., McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Sufficient evidence from which fact-finder could conclude that complainant was not rehired because of his illegal activities directed against the company and not due to his race); *Norcross v. Sneed*, 755 F.2d 113 (8th Cir.1985) (Legally-blind applicant for librarian position failed to show by sufficient evidence that she was not hired due to her handicap. Rather, the evidence showed that another applicant was better qualified and that complainant's handicap was not a factor in the hiring process); *McCarthney v. Griffin–Spalding County Bd. of Educ.*, 791 F.2d 1549 (11th Cir.1986) (Sex discrimination alleged when employer failed to promote woman. Sufficient evidence for fact finder to conclude that complainant's attitude and not her gender was the rationale for employer's failure to promote); *Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614 (6th Cir.1983), *cert. denied*, 466 U.S. 958, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984) (Sex discrimination alleged when male was dismissed from his supervisory position. Substantial evidence supported finding that employer terminated employee because of his sex. Assertion that employee was fired for poor work performance was merely pretextual);

*Jackson v. Shell Oil Co.*, 702 F.2d 197 (9th Cir. 1983) (Age discrimination alleged when company refused to allow 43 year old sales representative to transfer. Substantial evidence supported fact finder's determination that salesman received disparate treatment because of his age); *Bell v. Birmingham Linen Service*, 715 F.2d 1552 (11th Cir.1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984) (Sex discrimination claim alleging failure to promote women. There was substantial evidence to support employee's claim that gender was the cause of prohibited disparate treatment by employer); *Nanty v. Barrows Co.*, 660 F.2d 1327 (9th Cir. 1981). (Race discrimination alleged when Indian job applicant was not allowed to complete the application process. There was substantial evidence on the record to support the fact-finder's determination of subjective disparate treatment); *Barnes Hospital v. Missouri Commission on Human Rights*, 661 S.W.2d 534 (Mo. banc 1983) (Racial discrimination alleged when black employee was discharged. There was insufficient evidence to support Commission's finding of disparate treatment); *Kansas City v. Missouri Commission on Human Rights*, 632 S.W.2d 488 (Mo. banc 1982) (Sex discrimination alleged because women were paid less than men. Complainant did not prove by sufficient evidence that jobs held by women were similar to those held by men); *Percy Kent Bag Co. v. Missouri Commission on Human Rights*, 632 S.W.2d 480 (Mo. banc 1982) (Race discrimination alleged. There was sufficient evidence to support fact-finder's conclusion that complainant was terminated because of his race); *Anheuser–Busch Inc. v. Missouri Commission on Human Rights*, 682 S.W.2d 828 (Mo.App.1984) (Race discrimination alleged. Fact-finder had substantial evidence from which to conclude that employee's race was a reason for complainant being subjected to more frequent reviews and greater discipline than white co-workers); *St. Louis County Board of Election Commissioners v. Missouri Commission on Human Rights*, 668 S.W.2d 592 (Mo.App. 1984) (Sex discrimination alleged. Complainant sustained burden of proving her termination was gender-related); *Guhl Midtown Eye Care Optical v. Missouri Commission on Human Rights*, 653 S.W.2d 699 (Mo.App.1983) (Sex discrimination alleged because of disparate pay scales. There was sufficient evidence to support fact-finder's conclusion that employer failed to establish non-discriminatory grounds for its disparate treatment of female employee); *Cherokee Tobacco & Candy v. Civil Rights Enforcement Agency*, 662 S.W.2d 919 (Mo.App.1983) (Sex discrimination alleged when employer failed to hire pregnant female applicant. Complainant proved by competent and substantial evidence

now address the issues.

## POINT ONE

The thrust of Laclede's first point involves both phases of the analysis. The initial inquiry is objective, i.e., that complainant was not "otherwise qualified" to perform the functions and duties of a cab driver. Laclede further asserts that even if Williams is "handicapped" as contemplated by Section 296.010(4) RSMo 1978 and therefore capable of doing the job, there is no substantial or competent evidence on the record to show it was Laclede's subjective intent to discriminate against him as a result of his handicap.

■ Was there sufficient evidence from which the fact-finder could have concluded that, apart from his handicap, complainant was capable of performing the duties of a taxicab driver for Laclede? Laclede contends there was not. The evidence adduced at the hearing, when viewed in the light most favorable to the Commission's decision, clearly supports the finding of fact that complainant was "handicapped"[7] and that he was capable of performing the duties of a taxicab driver.[8]

Carla Baum, Director of Therapies at St. Mary on the Mount Rehabilitation Center, testified that complainant could competently operate a vehicle during rush hour traffic. Moreover, he could operate controls located to the right of the steering wheel with his right hand while at the same time maneuvering the steering wheel with his left stump. This directly supports the inference that complainant was otherwise qualified to do the job required. Further, there is evidence that complainant possessed a driver's license and pursuant thereto he could operate a motor vehicle without restrictions. Williams also testified, and Laclede did not rebut, that he held jobs subsequent to his amputation wherein he was required not only to drive vehicles, but also to lift, without assistance, large bulky objects including pallets, furniture and air-conditioners.

We are not persuaded by Laclede's contention that "common, everyday human experience tells us [that complainant could not do all of the things required of a cab driver] ... just as well with one hand as one can [do] with two hands." The issue in this phase of analysis is whether there is sufficient evidence to support William's contention that he was capable of performing the essential functions of the available job, not whether he could do them as well as others. From our reading of the record, Williams sustained the initial burden of showing he is objectively qualified to do the job.

■ The focus then becomes whether there is competent and substantial evidence from the record as a whole to support Williams' contention that Laclede subjectively considered his handicap when it refused to offer him employment. We find the record supports such a determination. We also find, however, that the proper remedy is an order that Williams is entitled to complete the application process for employment as a taxi driver, not that Laclede must hire Williams. In completing the application process Laclede shall not discriminate against complainant in any manner prohibited by this opinion. But the order of the Commission to employ Williams is premature and depends upon Williams'

that employer subjectively failed to hire her because of her pregnancy); *County of St. Louis v. Brooks,* 614 S.W.2d 283 (Mo.App.1981) (Race discrimination alleged when black employee was discharged after a fight. There was no substantial evidence offered by employee to prove employer subjectively discriminated against him).

7. Section 296.010(4) RSMo 1978 defines "handicap" as any "physical or mental impairment resulting in a disability unrelated to a person's ability to perform the duties of a particular job or position for which he would otherwise be eligible and qualified for employment or promotion."

8. The rules and regulations of the Missouri Commission on Human Rights further interpret and define Section 296.010(4) RSMo 1978. A "disability 'unrelated to a person's ability to perform the duties of a particular job or position'" is defined as "a disability which does not substantially interfere with a person's ability to perform the essential functions of the employment for which the person applies, is engaged in or had been engaged." 4 CSR 180–3.060(1)(F) (1980).

ability to pass a physical required by the City of St. Louis and satisfy all other requirements for the work.

We approach the second-phase by applying the analysis offered in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); and adopted by Missouri courts in *Midstate Oil Co. v. Missouri Commission on Human Rights*, 679 S.W.2d 842 (Mo. banc 1984). In order to establish a prima facie case of disparate treatment the complainant first must make a prima facie case from which the inference of discrimination can be drawn. The burden then shifts to the employer to articulate legitimate, non-discriminatory reasons for its personnel practices. Finally, assuming both steps have been sustained, the complainant must show that the reasons articulated by the employer are merely pretextual. *See, Missouri Commission on Human Rights v. St. Louis County Board of Election Commissioners*, 714 S.W.2d 873, 875–76 (Mo.App.1986).

█ We believe there was sufficient evidence to support the hearing examiner's determination that Matthew Williams established a prima facie case of handicap discrimination in the application process. By virtue of his amputation there was evidence (1) that he was a member of a class protected by Section 296.020(1) RSMo 1978, (2) that he was not hired by Laclede, and (3) that his handicap was a factor in Laclede's decision not to allow him to complete the application process. Evidence that handicap was a factor was supplied by Williams' testimony and by Vernon Jones, the Laclede supervisor. Both testified that Williams' application and exam were taken from him before completion because Laclede could not hire an amputee without losing its insurance coverage. This sufficiently establishes more than an "inference of discrimination." *Midstate Oil*, 679 S.W. 2d at 846[5].

█ The burden then shifted to Laclede to articulate legitimate, non-discriminatory, non-pretextual reasons for not hiring complainant. A review of the entire record indicates sufficient evidence from which the finder of fact could have concluded that

Laclede did not sustain its burden. As bases for Laclede's refusal to hire Williams, the company asserted, inter alia, (1) that his disability posed a threat to the safety of himself and others, (2) that his amputee-status would make him uninsurable, (3) that he did not possess, at the time of application, a valid chauffeur's or taxicab license, and (4) that his relatively new arrival to St. Louis made him incapable of passing Laclede's exam at the time of his application.

Before we review Laclede's assertions we repeat the admonition that it is not the function of this court to reweigh the evidence. *Cherokee Tobacco & Candy Company*, 662 S.W.2d at 920. We will not look at Laclede's contentions to determine if such are, in and of themselves, substantial and valid. Rather we will look to the record as a whole to see whether there was competent and substantial evidence to support the Commission's findings and conclusions.

Laclede argues it is their "sound position" that Williams could not perform the job safely to himself and others, and therefore the company had a legitimate, non-discriminatory right not to consider him for employment. This objective disqualification argument has been reviewed and rejected. There is no evidence in the record which indicates that Matthew Williams posed a threat of harm to anyone. In fact, the uncontroverted evidence is to the contrary. A rehabilitation expert testified that complainant safely performed during rush hour driving and that he did so by maneuvering the vehicle with his left stump while operating controls to the right of the car. Laclede offered no evidence that complainant could not safely transport passengers. Contrary to Lacledes' assertion, the record shows, if anything, that complainant could safely transport passengers and perform the various other duties of a taxicab driver.

█ The company places heavy reliance on their assertion that Williams' amputee-status would render the Laclede Cab Company uninsurable. The company relies on what it calls the "unassailable testimony" of George Heckman, President of Laclede's

insurer, who testified that cab companies were required to carry insurance in order to operate. The requirement is not in dispute. However, there was competent evidence in the record from which the factfinder could have concluded (1) that Williams' ability to safely operate a vehicle notwithstanding his handicap would not cause him to "seriously impair, if not jeopardize" Laclede's insurance program, and (2) that should his handicap affect their insurance, Laclede would not be precluded from seeking insurance from a specialty company, as noted by Mr. Heckman. Mr. Heckman did not testify and there is no other evidence in the record that the only available insurance would be prohibitively expensive in the sense that the cost would defeat the profit motive for Laclede. On the evidence, Laclede's claim of total disqualification for required insurance is speculative and not conclusive.

The Commission concluded that even if the insurance factor could be considered as a business justification for denying a handicapped applicant employment, in this particular case Laclede did not sustain its burden of showing that its insurance, based upon the qualifications of this particular applicant, would have in *fact* been seriously jeopardized or impaired. They offered no evidence to rebut the testimony that Williams was a qualified and safe driver. There was substantial and competent evidence on the record to support the hearing examiner's determination.

In view of the fact that this opinion entitles Williams to complete the application process, we note that if he is successful in his endeavors then a definitive decision on the ability of Laclede to maintain insurance coverage at a cost that is not prohibitive will be required. The law will not require Laclede to hire Williams, although otherwise qualified, if in fact the cost to insure him would be inordinately expensive.

■ Laclede next asserts that it did not hire Williams because at the time of application he did not possess a chauffeur's or taxicab license. This argument is without merit for several reasons. First, there was substantial and competent evidence based upon the testimony of Dale Hester from which the finder of fact could, and in fact did, conclude that a chauffeur's license was only a prerequisite to beginning the actual employment with Laclede, not a qualification for being conditionally hired. Second, the Director of the Department of Streets for the City of St. Louis testified that an individual could not apply for a taxicab license until he or she had been offered employment by a taxicab company. Third, there is evidence Williams obtained a chauffeur's license before the hearing. Laclede's argument that Williams could not have passed the physical examination which was a prerequisite to issuance of the license is not substantial. It is speculative because no physical was conducted. The record clearly shows that Williams was never considered for employment with Laclede and therefore could not even apply for a taxicab license or be required to take a physical exam. It is sufficient to note that if Williams cannot pass any required physical the dispute will be resolved.

Finally, Laclede alleges that Williams was not hired because he did not complete the geography examination. It is the company's assertion that in 1981, complainant was relatively new to the St. Louis area and as a result was uninformed and unable to answer questions on the examination. This inartful bootstrap argument is without merit. Substantial evidence supports a finding that complainant was not *allowed* to complete the examination and was never considered for employment. Assuming, arguendo, that he had been allowed to take the exam, the evidence supports the conclusion that his newcomer status may be irrelevant. Reginald Hester, whom the hearing examiner found very credible, testified that Laclede's President allowed him to interrupt the examination and drive around St. Louis in order to locate the buildings questioned on the test. Moreover, during the hearing Williams was able to recite locations for all of the landmarks requested by counsel, including hotels, train station, bus stations, etc.. Laclede's claim that Williams did not know enough geography to pass and would not have been allowed to

drive around and locate buildings merely reinforces the claim of disparate treatment.

Accordingly, based upon our review of the record as a whole, Laclede's claim that the Commission's finding of discrimination was not proven is rejected.

### POINT TWO

Laclede's second point alleges error in the award of back pay because there was no substantial and competent evidence on the record that Williams would have (1) continued to work for Laclede from his date of application, December 11, 1981, to the date of hearing, May 2, 1985, and (2) would have earned $80.83 per night. Moreover, the company contends the award of backpay was arbitrary and capricious.

Before addressing the "wherein and why" of Laclede's argument, we direct our analysis to whether the statutory language and interpretation of Section 296.040(7) RSMo 1978 permits the award of backpay in a failure-to-hire situation. After determining that unlawful employment practices have occurred, the permitted remedies which the Commission may employ include:

> "... an order requiring the respondent to cease and desist from such unlawful employment practice and to take affirmative action to require hiring, reinstatement *or* upgrading *or* restoration to membership in any respondent labor organization *with or without backpay,* as in its judgment will effectuate the purposes of this chapter ..." (Our emphasis).

Since every word, clause, sentence and section of an act must be given some meaning, *State ex rel. Missouri State Board of Registration for the Healing Arts v. Southworth,* 704 S.W.2d 219, 225[11] (Mo. banc 1986), a literal and strict construction of the above provisions would appear to allow backpay only in those instances where complainant previously was employed by the respondent employer.

However, our interpretation must also be made in view of the stricture that the interpretation and construction of a statute by the agency charged with its administration is entitled to considerable deference. *Weh-*

*meier v. Public School Retirement System,* 631 S.W.2d 893, 897 [8] (Mo.App.1982). In this case the Commission sanctioned the award of backpay based upon legislative changes in the wording of Section 296.040. The hearing examiner noted that the 1969 version of Section 296.040 permitted only complainants who were employees at the time of discrimination to be awarded backpay. In support thereof, the examiner cited Section 296.040(6) RSMo 1969 wherein the Commission could affirmatively require the "reinstatement or upgrading of employees with or without backpay, to require hiring...." However, this section was repealed and rewritten by the legislature in 1978. It was the examiner's position that the language found in Section 296.040(7) RSMo 1978 permitted "hiring, reinstatement or upgrading or restoration to membership in any respondent labor organization with or without backpay ..." and allowed the Commission to award backpay to complainants who had been discriminatorily denied employment. This interpretation is consistent with the notion that when the legislature has altered an existing statute such change is deemed to have an intended effect, and the legislature will not be charged with having done a meaningless act. *State v. Sweeney,* 701 S.W.2d 420, 423 [1–3] (Mo. banc 1985).

██ Although the difference in statutory wording between the 1969 and 1978 versions may not appear to be substantial, we are reminded that courts should be wary of adopting a literal interpretation of a statute without considering extrinsic aids to construction, *Linquist v. Bowen,* 633 F.Supp. 846 (W.D.Mo.1986), such as, the legislature's construction and an agency's interpretation. In this regard, it was the express intent of the legislature that the provisions of Chapter 296 RSMo 1978 be "construed liberally for the accomplishment of the purposes thereof...." Section 296.070 RSMo 1978. One of the principal purposes of the Statute is to take affirmative action to prevent discrimination in employment. Section 296.020 RSMo 1978. Similarly, we realize that the Commission's decision to allow backpay is binding on this

court, though it may not be the only permissible interpretation, provided however, that the Commission's interpretation is rational and reasonable. *Bailey v. Federal Intermediate Credit Bank of St. Louis,* 788 F.2d 498, 499–500[1, 2] (8th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 317, 93 L.Ed 290 (1986).

■ However, we are not convinced that the award of backpay in a case like this is reasonable in view of the constraints of Section 296.040.7 RSMo 1978. We have found cases sanctioning the award of backpay in failure-to-hire situations [9] however, these were premised upon Title VII of the Civil Rights Act of 1964. Therein the statutory language clearly makes backpay appropriate in failure-to-hire situations:

> If the court finds that the respondent [employer] has intentionally engaged in or is intentionally engaging in an unlawful employment practice ..., the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, *reinstatement or hiring of employees, with or without backpay....* (Our emphasis).

42 U.S.C. Section 2000e–5(g). It is obvious that Section 296.040(7) RSMo 1978 markedly differs from 42 U.S.C. Section 2000e–5(g) in the affirmative action to which an award of backpay applies. Because the wording and sentence structure are different we cannot presume that the legislature meant Section 296.040.7 RSMo 1978 to exactly pattern the effect of Section 2000e–5(g). Rather, we are constrained by the fundamental precept that when construing a statute we must presume the legislature acted with full awareness and complete knowledge of the subject matter and present state of existing law when it enacted a particular provision. *State v. Rumble,* 680 S.W.2d 939, 942 [4] (Mo. banc 1984); *Holt v. Burlington Northern Railroad Company,* 685 S.W.2d 851, 857 [9,10] (Mo.App.1984). In this respect, the 1978 version of Section 296.040.7 allows the

Commission to affirmatively require "hiring" of a discriminated job applicant *and* allows "reinstatement or upgrading or restoration to membership in any respondent labor association with or without backpay." Unlike the federal statute, the wording of the Missouri statute does not clearly contemplate an award of backpay in a failure-to-hire situation.

We conclude that an award of backpay is not legally justified in a failure to hire situation under Section 296.040(7) RSMo 1978. We do not believe our determination is contrary to the legislative intent and purpose relating to discriminatory employment hiring practices. A fundamental purpose of Chapter 296 is to assure equality of employment opportunities and to eliminate those discriminatory practices which have fostered segregated and stratified job environments. *See generally,* Section 296.-020–.030 RSMo 1978; *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973). We believe it is consistent with the goal and spirit of Chapter 296 to protect an individual who was discriminated against in the hiring process by affirmatively requiring an employer to resume the hiring process *sans* any objective or subjective discriminatory practice. By affirmatively requiring the job applicant to complete the application process and giving him an opportunity he was previously denied, the complainant has, in essence, been made "whole" again. Unlike the individual who actually worked for the respondent employer and who was discriminatorily fired, demoted or not promoted, the job applicant never had a vested right or expectation to receive a salary or wage for the work performed. Consequently, it is logical to make a backpay award appropriate in those instances when reinstatement, upgrading, or restoration to membership is required, but not when initial hiring is or may be ordered. In the former situation proof of earnings may be based on a history of earnings. In the latter situation proof of earnings is more speculative. This difference may explain

---

**9.** *See, e.g., Cherokee Tobacco & Candy v. Civil Rights Enforcement Agency,* 662 S.W.2d 919, 921 (Mo.App.1983); *Stone v. D.A. & S. Oil Well Servicing, Inc.,* 624 F.2d 142, 144 (10th Cir.1980).

the intention of the legislature in distinguishing between hiring without backpay and reinstatement or upgrading or restoration with backpay as provided in Section 296.070 RSMo 1978.

While the Commission might prefer to allow this particular complainant to receive back wages for the years in which he was unemployed, Section 296.040(7) RSMo 1978 does not permit such award. This is a matter for the legislature to consider and it is not within our province to change.

We reverse and remand this case to the circuit court for remand to the Commission to enter an amended order which: (1) orders Laclede to permit Williams to complete the process of application for employment as a taxicab driver; (2) enjoins any discriminatory acts against complainant; (3) orders Laclede to employ complainant, if qualified, in a manner not inconsistent with all legal requirements for such employment and with this opinion; and, (4) withdraws any award of backpay.

We reverse and remand with directions.

KELLY, J., concurs in result.

SMITH, J., dissents in separate opinion.

SMITH, Judge, dissenting.

I respectfully dissent.

I believe the majority opinion has applied an incorrect burden of proof in this case. It is undisputed that cab drivers must be insured. To make a prima facie case the applicant must establish that he is qualified for the position he seeks. For a cab driver position he must prove he is insurable. Williams did not do so.

If a prima facie case is established, which I do not believe it was, then the employer must advance a legitimate reason for denying the employment. The employer advanced the uninsurability of the applicant here as the reason for denial of employment. It further presented evidence to support that reason. If insurability is a prerequisite to employment as a cab driver and if applicant's handicap makes him uninsurable or insurable only at excessive cost to the employer then he is not qualified for employment. The reason advanced for non-employment is a legitimate one. It acquires a pretextual nature only if it is untrue.

The burden to establish the pretextual nature of the reason is upon the applicant. It is not the burden of the employer to establish that Williams is uninsurable; it is Williams' burden to prove that he is insurable. The majority recognizes that insurability is a job qualification in its holding that after Williams has completed the application process "then a definitive decision on the ability of Laclede to maintain insurance coverage at a cost that is not prohibitive will be required." Op. p. 398. Before Laclede can be found guilty of discriminatory non-hiring it must be established that the applicant is qualified and that the reason given for the non-hire is pretextual. By the majority's own statement that has not been done. It was Williams' burden to make that proof and he did not.

One comment is in order concerning the conclusions of law of the hearing examiner. In determining that uninsurability was not a defense, the examiner relied upon a portion of the Commission's regulations, 4 CSR 180–3.060(F)(1) which states: "uninsurability or increased cost of insurance under a *group or employee insurance plan* does not render a disability job related." (Emphasis supplied). That language obviously relates to an insurance plan such as health or life furnished to employees as a benefit of their employment. Presumably an uninsurable employee can waive such a benefit and does so by seeking and taking the employment. The provision does not apply to liability insurance where insurability is an indispensable qualification for the job. To apply the provision to that situation is to require an employer to hire an employee who is disqualified from working.

I would reverse the decision of the Commission.