MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION *vs.* LIBERTY MUTUAL INSURANCE COMPANY.

Suffolk.    April 7, 1976. — October 13, 1976.

Present: REARDON, QUIRICO, BRAUCHER, & KAPLAN, JJ.

*Massachusetts Commission Against Discrimination.    Quasi Judicial Tribunal.    Statute,* Construction.    *Subpoena.*

Under G. L. c. 151B, § 3 (6) and (7), the Massachusetts Commission Against Discrimination has the authority to issue a subpoena duces tecum during the course of an investigation and before a finding of probable cause. [187-194]

BILL IN EQUITY filed in the Superior Court on January 21, 1972.

The suit was heard by *Lynch,* J.

After review was sought in the Appeals Court, the Su-

371 Mass. 186                                              187

Mass. Comm'n Against Discrimination *v.* Liberty Mutual Ins. Co.

preme Judicial Court, on its own initiative, ordered direct appellate review.

*Marc S. Seigle,* Assistant Attorney General, for the plaintiff.

*Kalvin M. Grove* of Illinois (*Robert A. Penney* with him) for the defendant.

QUIRICO, J.   This case raises the question, never before directly addressed by this court, whether the Massachusetts Commission Against Discrimination (commission) has power to issue a subpoena duces tecum for the production of books and records during an investigation and before a finding of probable cause. We hold that, pursuant to G. L. c. 151B, § 3 (6) and (7), the commission does have such power.

On June 10, 1971, the commission, of its own initiative, issued a complaint against Liberty Mutual Insurance Company (Liberty Mutual) pursuant to G. L. c. 151B, § 5, as amended through St. 1969, c. 751, §§ 10-12.[1] The complaint was accompanied by a letter addressed to Liberty Mutual indicating that the "function of ... [the] charge is to initiate an investigation." The letter asked that a questionnaire relating to the matters under investigation be filled out and returned. On July 6, 1971, Liberty Mutual notified the commission that it would not respond to the questionnaire.

On September 7, 1971, the commission issued a subpoena duces tecum requiring Liberty Mutual to produce specified books and records[2] "for examination" by the com-

---

[1] The complaint stated that "[t]he Commission has reason to believe and thus specifically charges that [Liberty Mutual] has engaged in unlawful employment practices in violation of Chapter 151B, Section 4 ...." It went on to charge that "[t]he recruitment, hiring, promotion and other employment practices of [Liberty Mutual] have resulted in the exclusion of many women from positions equal to their education and experience."

[2] The subpoena ordered the production of the following documents: "(1) The original or a copy of all organizational charts or line and staff descriptions of the company's operations for the period 1965 to

188                                                  371 Mass. 186

Mass. Comm'n Against Discrimination *v.* Liberty Mutual Ins. Co.

mission "relative to a matter under investigation or in question . . . ." On September 21, Liberty Mutual filed a petition with the commission to vacate the subpoena alleging, inter alia, that the commission was without power to issue such subpoena. After amending its complaint to state more specifically the alleged unlawful employment practices referred to in the original complaint,[3] the commission, on December 17, 1971, denied Liberty Mutual's petition to vacate, withdrew items six and ten from the list of material to be produced, and ordered the production of all other items for immediate inspection.

Liberty Mutual continued to refuse compliance with the commission's subpoena. As a result, the commission

---

date. (2) The original or copies of all personnel records of all nonclerical employees presently employed by the company. (3) The original or copies of all payroll records maintained by the company for all nonclerical personnel covering a period of one year prior to the present date. (4) The original or copies of all personnel records of all employees terminated, laid off or dismissed for a period of one year prior to the present date. (5) The original or copies of all employment applications filed in the period covering one year from the present date. (6) Copies of all reports submitted to the Joint Reporting Committee in Washington, D.C. — form EEO-1 — for 1965 to date. (7) Copies of all advertising materials used to recruit employees in the past two years, including but not limited to, tear sheets and copies of job orders sent to employment agencies. (8) The original or copies of all job description listings and all salary range listings applicable thereto for the period January, 1970, to date. (9) The original or copies of all training program descriptions and manuals and the original or copies of listings of persons enrolled therein for the past three years to date. (10) Copies of all collective bargaining agreements and amendments thereto to which the respondent is a party. (11) Copies of all international pamphlets made available to employees which describe employment benefits, insurance policies and leave practices. (12) The original or copies of any written policy statements maintained by your personnel department for the past three years to date describing the above policies and benefits."

[3] The new allegations were as follows: ". . . that female employees and applicants are channeled into secretarial positions regardless of their education and experience and without the equal opportunity for advancement offered to male employees or applicants; that there is an over-all higher concentration of women in clerical positions and a low representation of women in managerial and professional positions; that Liberty Mutual Insurance Company employment brochures refer solely to the advancement opportunities available to men."

371 Mass. 186                                        189

Mass. Comm'n Against Discrimination *v.* Liberty Mutual Ins. Co.

brought a "Bill of Enforcement" on January 21, 1972,[4] pursuant to G. L. c. 233, § 10. After a hearing in the Superior Court, the judge entered an order and judgment denying the commission's "Bill of Enforcement" in its entirety and quashing the subpoena duces tecum. The case is before this court on appeal from that judgment, it having been transferred from the Appeals Court to this court on our motion. G. L. c. 211A, § 10 (A), inserted by St. 1972, c. 740, § 1.

It is well settled that the commission, as a board created by statute (G. L. c. 6, § 56, and G. L. c. 151B, both as amended), has only those powers, duties and obligations conferred upon it by statute and those reasonably necessary for its proper functioning. *Scannell* v. *State Ballot Law Comm'n,* 324 Mass. 494, 501 (1949). *Hathaway Bakeries, Inc.* v. *Labor Relations Comm'n,* 316 Mass. 136, 141 (1944), and cases cited. The power to issue a subpoena is one which the commission would not possess absent such statutory authority. See *Donatelli Bldg. Co.* v. *Cranston Loan Co.,* 87 R.I. 293, 297 (1958). See also Cooper, Federal Agency Investigations: Requirements for the Production of Documents, 60 Mich. L. Rev. 187, 188 (1961). Accordingly, our inquiry must begin with the statutes creating the commission and vesting powers therein.

The commission is established by G. L. c. 6, § 56, as amended, and its functions, powers and duties, in so far as this case is concerned, are prescribed by G. L. c. 151B, § 3, as amended. Pursuant to the latter statute, the commission has the power "6. [t]o receive, investigate and pass upon complaints of unlawful practices." It also has the power "7. [t]o hold hearings, subpoena witnesses, compel their attendance, administer oaths, take the testimony of any person under oath, and in connection therewith, to require the production for examination of any books or papers relating to any matter under investigation or in question before the commission." It is clear that the com-

---

[4] The "Bill of Enforcement" was brought in the name of Glendora M. Putnam, the Commissioner assigned to investigate in this case.

mission has authority to order the production of books and records during the hearing stage of the proceedings. The commission argues that this power extends to the investigatory stage, claiming that the language "relating to any matter under investigation or in question" controls. Liberty Mutual argues that the subpoena power exists only "in connection" with hearings, relying on that particular language of the statute. It is our duty to determine which reading, if either, of the two readings is correct.

"In construing statutes, '[t]he general and familiar rule is that a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated.' " *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513 (1975), quoting from *Industrial Fin. Corp.* v. *State Tax Comm'n*, 367 Mass. 360, 364 (1975). *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). Where there is a contradiction in the statute, "[i]t is our duty to interpret ... [it], if possible, so 'as to make it an effectual piece of legislation in harmony with common sense and sound reason.' " *Atlas Distrib. Co.* v. *Alcoholic Beverages Control Comm'n*, 354 Mass. 408, 414 (1968), quoting from *Morrison* v. *Selectmen of Weymouth*, 279 Mass. 486, 492 (1932).

The statute in question, G. L. c. 151B, "in certain aspects lacks precision and verbal consistency." *LaPierre* v. *Massachusetts Comm'n Against Discrimination*, 354 Mass. 165, 174 (1968). Where, as here, "[t]he draftsmanship is faulty, ... the duty devolves upon us to give ... [the statute] a reasonable construction." *Massachusetts Turnpike Authority* v. *Commonwealth*, 347 Mass. 524, 528 (1964). In doing so, we should take care to construe the statute to carry out the legislative intent, *Industrial Fin. Corp.* v. *State Tax Comm'n, supra* at 364; *Commissioner of Corps. & Taxation* v. *Assessors of Boston*, 324 Mass. 32, 36 (1949), giving effect to all words in the statute but not overemphasizing

any. *Commonwealth* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Authority*,.352 Mass. 617, 618 (1967). See *Commonwealth* v. *Mercy Hosp.*, 364 Mass. 515, 521 (1974). It is therefore necessary that we look to the intent of the Legislature in enacting G. L. c. 151B to determine whether the commission has power to issue a subpoena duces tecum during the course of an investigation.

General Laws c. 151B was enacted in response to the growing concern over the existence of discrimination in employment. 1946 House Doc. No. 400. "The law [was] based on the concept that opportunity for employment without discrimination is a civil right." Governor's Committee for Racial and Religious Understanding, Public Policy Pamphlet 9 (Rev. 1947), quoting from New York State Commission Against Discrimination, "Inside Facts." Largely, the purpose of the bill was to educate employers and employees and, through the existence of the law, to encourage an end to discrimination. 1946 House Doc. No. 400, at 6.

While the act stressed the use of "education, persuasion, and conciliation" to eliminate discrimination, it nevertheless gave the commission considerable power to proceed where appropriate to ensure that efforts to eliminate discrimination would be successful. L. Mayhew, Law and Equal Opportunity 111 (1968). It was in this context that the power to investigate and process complaints was included among those granted to the commission.

The investigation of complaints "is an important step in a longer process that may eventually lead to a formal hearing followed by findings and an order. G. L. c. 151B, § 5." Rep. A. G., Pub. Doc. No. 12, at 95, 96 (1969).[5] With-

---

[5] The legislative scheme for the commission is comprised of the following steps: (1) the filing or initiation of a complaint; (2) investigation of the charge; (3) a determination, based on the investigation, whether probable cause exists to credit the complaint. If probable cause is found, the investigating Commissioner calls the parties together in an effort to conciliate. If that fails, an adjudicatory hearing is held. If no probable cause is found, the party initiating the complaint may request a preliminary hearing to determine whether probable cause exists. G. L. c. 151B, § 5. See also L. Mayhew, Law and Equal Opportunity 108-109 (1968).

out adequate investigation, the commission's functions "would be seriously hampered and the realization of the statute's broad and humane purposes would be materially impaired." *Ibid.* Unless the commission has the power to obtain necessary information during the course of its investigations, the broad remedial purposes of the legislation cannot be effectuated, and the commission will be unable to function effectively. See Comment, 43 U. Colo. L. Rev. 345 (1971). Cf. *Graniteville Co.* v. *Equal Employment Opportunity Comm'n,* 438 F.2d 32, 36 (4th Cir. 1971). A construction of the statute which leads to such a result is disfavored and should not be adopted. Stone, Common Law in the United States, 50 Harv. L. Rev. 4, 18 (1936).

It is clear that the commission has power to subpoena documents during the hearing stage. G. L. c. 151B, § 3 (7). The question before us is whether that power also extends to the investigation. In light of the importance of the investigatory stage of the proceedings,[6] and considering the stated legislative policy that the act be "construed liberally for the accomplishment of . . . [its] purposes," G. L. c. 151B, § 9, as amended through St. 1965, c. 397, § 7, we hold that the logical reading of G. L. c. 151B, § 3 (6) and (7), when taken together, authorizes the commission to issue a subpoena duces tecum during the course of an investigation.

Our holding here is consistent with the conclusion reached by the Attorney General in his opinion on the subject. Rep. A. G., Pub. Doc. No. 12, at 95, 97 (1969). It is also consistent with the interpretation given to the New York statute on which the Massachusetts statute was based.[7] See *Liberty Mut. Ins. Co.* v. *City of N.Y.,*

---

[6] The overwhelming majority of complaints processed by the commission in its first eighteen years of operation were settled before the hearing stage, after investigation and conference. See Mayhew, *supra* at 141.

[7] "The Massachusetts Act [was] modeled upon the Ives-Quinn Bill which was put into operation in the State of New York a little over a year before the passage of the Massachusetts law." Governor's Committee for Racial and Religious Understanding, Public Policy Pamphlet 9 (Rev. 1947). See 1946 House Doc. No. 400.

*Comm'n on Human Rights,* 31 N.Y.2d 1044 (1973), aff'g 39 App. Div. 2d 860 (1972), aff'g No. 19284/1971 (Sup. Ct., N.Y. County); *State Comm'n for Human Rights* v. *Local 13, United Ass'n of Plumbing & Pipe Fitting,* 56 Misc. 2d 98 (N.Y. 1968); *In re Broido,* 40 Misc. 2d 419 (N.Y. 1963).

We note that neither this court's decision in *Massachusetts Comm'n Against Discrimination* v. *Boston & Me. R.R.,* 357 Mass. 783, 784 (1970), nor the decision of the Colorado Court of Appeals in *Colorado Civil Rights Comm'n* v. *Adolph Coors Corp.,* 29 Colo. App. 240 (1971), compels a different result. In the *Boston & Me. R.R.* case, the trial judge had determined that the information and material sought by the subpoena issued by the commission did not "in any way relate to the matter" under investigation and was therefore not authorized by statute. We expressed no opinion, however, as to the investigatory subpoena power of the commission itself. In the *Coors* case, the Colorado court was asked to determine whether the Civil Rights Commission had statutory authority to issue an investigatory subpoena. The court held that it did not. However, the wording of the Colorado statute is significantly different from that of the Massachusetts statute,[8] and thus that court's interpretation is not persuasive.

We are similarly not persuaded by the Legislature's failure in 1972 to enact legislation which would have amended the statute to authorize specifically the issuance of a subpoena during the course of an investigation by the commission. See 1972 House Bill No. 80; 1972 House Bill No. 2780. Such inaction by a subsequent legislative body "has no persuasive significance" with reference to the in-

---

[8] Colorado Rev. Stat. § 24-34-305 (1973), formerly Colo. Rev. Stat. § 80-21-5 (1963), provides that the commission has power "[t]o hold hearings upon any complaint made against a person ... ; to subpoena witnesses and compel their attendance; to administer oaths and take the testimony of any person under oath; and to compel [the] employer ... to produce for examination any books and papers *relating to any matter involved in such complaint*" (emphasis added). The Massachusetts statute requires the production of books or papers "relating to *any matter under investigation or in question before the commission*" (emphasis added). G. L. c. 151B, § 3 (7).

tent of the Legislature which passed the original bill. *Devlin* v. *Commissioner of Correction,* 364 Mass. 435, 442-443 (1973). *United States* v. *Wise,* 370 U.S. 405, 411 (1962). "[T]he views of a subsequent [Legislature] form a hazardous basis for inferring the intent of an earlier one." *United States* v. *Price,* 361 U.S. 304, 313 (1960). *Wong Yang Sung* v. *McGrath,* 339 U.S. 33, 47-48, modified, 339 U.S. 908 (1950). *Helvering* v. *Hallock,* 309 U.S. 106, 119-121 (1940).

Additionally, we will not draw the inference that the commission believed it was without the power requested from the fact that the legislation was introduced. Such an inference would be merely speculative and might serve to chill the agency's freedom to seek "clarifying legislation on a genuinely debatable point of agency procedure...." *Wong Yang Sung* v. *McGrath, supra* at 47. Cf. *Commonwealth* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Authority,* 352 Mass. 617, 619-620 (1967).

On the basis of what we have said above, we reverse the judgment of the Superior Court quashing the subpoena in its entirety and denying the commission's "Bill of Enforcement." We remand the case to the Superior Court to consider and decide whether the subpoena is so broad, oppressive and burdensome that it should be quashed in its entirety or whether it should be quashed in part and upheld in part.

*So ordered.*